UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ANTHONY CARR,                    :
       Petitioner,          :
                   :    No. 3:19-CV-274-DMB
   v.                  :
                   :    CAPITAL HABEAS CORPUS
NATHAN CAIN, Mississippi         :
Corrections Commissioner, and    :
LYNN FITCH, Attorney General,    :
       Defendant.            :

---

**INITIAL PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

---

JOSEPH J. PERKOVICH
Phillips Black, Inc.
P.O. Box 4544
New York, NY 10163-4544
(212) 400-1660 (tel.)
(888) 543-4964 (fax)
j.perkovich@phillipsblack.org

LAURA WELIKSON
Bradley Arant Boult Cummings LLP
One Jackson Place
188 E. Capital Street, Ste. 1000
Jackson, MS 39201
(601) 592-9959 (tel.)
(601) 948-3000 (fax)
lwelikson@bradley.com

*Counsel of Record for Petitioner*

September 14, 2020

# TABLE OF CONTENTS

I. PROCEDURAL POSTURE & HISTORY ................................................... 1

   A. Federal Jurisdiction and Venue ................................................. 1

   B. Judgment and Prior Decisions ................................................. 1

II. GOVERNING HABEAS CORPUS LAW .............................................. 2

   A. Prospective Procedural Defenses............................................... 2

   B. Fact Development Procedures Under Habeas Rules 6, 7, And 8............................ 4

   C. Application of AEDPA ......................................................... 4

III. GOVERNING SIXTH AMENDMENT JURISPRUDENCE ................................... 11

   A. The Performance Prong ....................................................... 12

   B. The Prejudice Prong........................................................... 13

IV. STATEMENT OF THE CASE..................................................... 15

V. GROUNDS FOR RELIEF ........................................................ 26

   A. Categorical Eighth Amendment Violations.......................................... 26

     No. 1:   The State Courts' Findings and Conclusions that Mr. Carr Failed to Prove that He is Intellectually Disabled and Therefore that the State is Prohibited from Imposing a Death Sentence Upon him, Violated the Eighth and Fourteenth Amendments.............. 26

     No. 2:   Mr. Carr's *Atkins* Counsel Performed Below the Standard of Care, Depriving him of his Right to the Effective Assistance of Counsel, Violating the Sixth, Eighth, and Fourteenth Amendments............................... 37

     No. 3:   The Jury Lacked Sufficient Evidence to Find the Necessary Lethal Intent to Permit a Death Sentence, Violating the Eighth and Fourteenth Amendments... 40

     No. 4:   Because Mr. Carr is Factually Innocent (A) of this Capital Conviction and (B) the Aggravating Circumstances that his Jury Was Adjudged to Have Found Against him, his Judgment Violates the Eighth and Fourteenth Amendments.............................................. 44

   B. Pretrial Proceedings ........................................................... 45

     No. 5:   The Trial Court Transferred the Case to a County with Radically Different Racial Makeup Among the Voting Age Population Than That of the Original Venue, Violating the Sixth and Fourteenth Amendments.................. 45

     No. 6:   The Trial Court Failed to Remedy the Prejudicial Publicity Caused by Prosecutorial Misconduct, Violating the Sixth and Fourteenth Amendments. ..49

   C. Jury Selection & Conduct ....................................................... 53

     No. 7:   The Trial Court Failed to Remedy the Prejudicial Pretrial Publicity Identified During Voir dire in Alcorn County, Violating the Sixth and

Fourteenth Amendments.........................................................................53

No. 8: The Trial Court Denied Mr. Carr's Request for Individual Sequestered Voir dire, Violating the Sixth and Fourteenth Amendments. ....................................55

No. 9: The State Exercised a Peremptory Strike in a Racially Discriminatory Manner, Violating the Sixth and Fourteenth Amendments..............................59

No. 10: The Trial Court Erred in Allowing the State to Use a Peremptory Strike in a Discriminatory Manner, Violating the Sixth and Fourteenth Amendments.......63

No. 11: Juror Interference, Misconduct, and Bias Occurred Due to External Communication During Mr. Carr's Trial, Violating the Sixth and Fourteenth Amendments. ...................................................................................65

D. Liability Phase ...................................................................................... 67

No. 12: Trial Court's Grant of Jury Instruction S-5 Created an Improper Presumption of Guilt, Relieving the State of the Burden of Proving Mr. Carr's Intent to Commit the Underlying Felonies, Thereby Violating the Due Process Clause of the Fourteenth Amendment. ...........................67

No. 13: The Trial Court Permitted the Introduction of Anthony Washington's Materially False Testimony, Violating the Fourteenth Amendment. .................71

No. 14: The State Court Determined that Jailhouse Snitch Anthony Washington's Sworn Recantation Evidencing that he Had in Fact Testified against Mr. Carr in Exchange for a Promise to Avoid Prison Time Did Not Create a Reasonable Probability of a Different Trial Result, Violating Due Process under the Fourteenth Amendment. ..........................................76

No. 15: The Trial Court Erred in Excluding Testimony Regarding Inculpatory Statements made by Mr. Carr's Codefendant, Violating Mr. Carr's Right to a Fair Trial. ....................................................................................83

No. 16: The State Made Prejudicial Statements About Mr. Carr's Decision Not to Testify, Violating the Fifth and Fourteenth Amendments.............................84

No. 17: The State, in Relation to the State's Snitch Testimony, Prejudicially Commented on Mr. Carr's Right to Silence, Violating the Fifth and Fourteenth Amendments.....................................................................86

No. 18: The Trial Court's Failure to Exclude Dr. Carlyle's Testimony Violated the Confrontation Clause of the Sixth Amendment and Mr. Carr's Right to Due Process under the Fourteenth Amendment.........................................88

No. 19: The Trial Court Erred in Instructing the Jury that "Deliberate Design" Could "Exist in the Mind of the Defendant But for an Instant," Violating the Sixth and Fourteenth Amendments...........................................................93

No. 20: The Trial Court's Jury Instructions Violated Carr's Right to a Fair Trial and Due Process under the Sixth, Fifth, and Fourteenth Amendments...................95

No. 21: The Trial Court Failed to Instruct the Jury on Finding an Essential Element of the Crime of Kidnapping, Violating the Sixth and Fourteenth Amendments. ...................................................................................97

ii

No. 22:   The Trial Court Erred in Permitting Portions of the Trial to Take Place Outside the Presence of Mr. Carr, Violating the Sixth and Fourteenth Amendments.................................................................100

E. Sentencing Phase...............................................................................101

No. 23:   Trial Counsel Completely Failed to Prepare Mitigation Evidence, Violating the Sixth, Eighth, and Fourteenth Amendments................................................101

No. 16:   The Trial Court Erred in Allowing the Prosecution to Elicit Hearsay Evidence in Violation of Mr. Carr's Confrontation Clause and Due Process Rights Guaranteed by the Sixth and Fourteenth Amendments.......................104

No. 25:   The Trial Court Erred In Excluding Exculpatory Statements Favorable to Mr. Carr in Violation of the Sixth, Eighth, and Fourteenth Amendments. ......107

No. 26:   The Trial Court Erred in Excluding Expert Testimony in the Penalty Phase that Mr. Carr Passed a Polygraph Examination, Violating his Right to Present Mitigating Evidence and Due Process Guaranteed by the Sixth, Eighth and Fourteenth Amendments. ...............................................................108

No. 27:   The Trial Court's Failed to Instruct the Jurors they Could sentence Mr. Carr to Life even if Aggravating Factors Outweighed Mitigating ones, Violated the Eighth and Fourteenth Amendments. ........................................................110

No. 28:   The Trial Court Erred in its Limiting Instruction of the Aggravating Circumstance that the Offense was "Especially Heinous, Atrocious, or Cruel," Violating the Eighth and Fourteenth Amendments. ...........................114

No. 29:   The Trial Court Erred in Allowing the Jury to Consider the "Pecuniary Gain" Aggravating Circumstance, Violating the Eighth and Fourteenth Amendments. ...................................................................................117

No. 30:   The State Made Inappropriate and Prejudicial Statements Regarding Biblical Law, Violating Mr. Carr's Right to a Fair Trial and Due Process under the Fifth, Sixth and Fourteenth Amendments............................................118

No. 31:   Trial Court's Failure to Give Peremptory Instructions to the Jury on Undisputed Mitigating Circumstances Violated the Sixth, Eighth,  and Fourteenth Amendments.................................................................121

No. 32:   Trial Court's Failure to Instruct the Jury to Make Written Findings of the Specific Aggravating Circumstances Unanimously Found Beyond a Reasonable Doubt Violated the Sixth and Fourteenth Amendments. ..............124

No. 33:   The Mississippi Supreme Court Failed to Properly Consider the Proportionality of the Death Penalty for Mr. Carr, Violating his Liberty Interests under the State's Sentencing Statute as Guaranteed by the Eighth and Fourteenth Amendments..........................................................129

VI.  PRAYER FOR RELIEF .........................................................................131

# I. PROCEDURAL POSTURE & HISTORY

## A. FEDERAL JURISDICTION AND VENUE

Petitioner, Anthony B. Carr, by and through his undersigned counsel, appointed pursuant to 18 U.S.C. § 3599 in the above-captioned cause (Docs. #5 and #7), hereby applies for a writ of habeas corpus, seizing the District Court's jurisdiction under 28 U.S.C. § 2241 and 2254. Mr. Carr seeks relief in this venue from a Quitman County Circuit Court capital judgment entered on September 19, 1990 (*infra*), and affirmed on direct appeal in the Mississippi Supreme Court (*infra*), and challenged unsuccessfully in state post-conviction proceedings, also affirmed in the state high court (*infra*). § 2241(d).

## B. JUDGMENT AND PRIOR DECISIONS

On March 12, 1990, a grand jury of Quitman County issued four capital murder indictments against Mr. Carr concerning the homicides of Charlotte, Carl, Gregory, and Bobbie Jo Parker on the night of February 2, 1990. *Carr v. State*, 655 So.2d 824, 828 (Miss. 1995) (*Carr I*). Pursuant to the District Attorney, the grand jury nol-prossed these indictments. On June 27, 1990, the same grand jury issued a fifth indictment, on four counts of capital murder.

Due to pretrial publicity, the Honorable Elzy J. Smith ordered a change of venue to the Circuit Court of Alcorn County. Jury selection began on September and the court empaneled Carr's jury on September 10, 1990. On September 11, 1990, the trial court invited the parties to make their opening statements in the liability phase of the bifurcated capital trial. That phase of was submitted on September 18, whereupon the jury convicted Carr of the four counts of capital murder. The following day, the penalty phase was held and the jury returned a sentence of death. The trial court denied Carr's motion for new trial on October 15, 1990 and . Thereafter, Carr perfected his appeal from the capital judgment.

The Mississippi Supreme Court entered its opinion affirming the judgment on February 2, 1995, denying its rehearing on June 22, 1995. *Carr v. State*, 655 So.2d 824 (Miss. 1995) (*Carr I*). Mr. Carr then timely sought a petition for writ of certiorari from the United States Supreme Court, which the Court denied on January 16, 1996. *Carr v. Mississippi*, 516 U.S. 1076 (1996).

On October 23, 2001, attorneys for the Mississippi Office of Capital Post-Conviction Counsel, prepared and filed on behalf of Carr in the Mississippi Supreme Court an Application for Leave to File Petition for Post-Conviction Relief and Memorandum in Support Thereof. On May 20, 2004, the state court denied the application entirely, except for Carr's request for an evidentiary hearing pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), which was decided during the pendency of the application and precipitated a remand of the case to the trial court to conduct an evidentiary hearing. *Carr v. State* , 873 So.2d 991, 1007 (Miss. 2004) (*Carr II*). On June 19, 2013, the Quitman County Circuit Court denied relief on *Atkins* after a hearing on February 6, 2013. On August 11, 2016, the Supreme Court of Mississippi reversed and remanded for additional findings from the trial court. *Carr v. State*, 196 So.3d 926 (Miss. 2016) (*Carr III*). After new findings from the trial court once again denying relief, the state supreme court once again reviewed the issue, affirming the Quitman County Circuit Court's decision and denying rehearing of same on September 12, 2019. *Carr v. State*, 283 So.3d 18 (Miss. 2019) (*Carr IV*).

## II.  GOVERNING HABEAS CORPUS LAW

### A.  PROSPECTIVE PROCEDURAL DEFENSES

In order to obtain federal relief, petitioners generally must exhaust state court remedies. 28 U.S.C. § 2254(b)(1)(A). Petitioner submits that each of the claims herein is either exhausted or falls within an exception to the exhaustion requirement. *Picard v. Connor*, 404 U.S. 270 (1971); *Ex parte Royall*, 117 U.S. 241 (1886). Because procedural default—like non-

exhaustion—is a defense subject to waiver and forfeiture rules, Petitioner shall rely on the express, written waiver of the State in relation to a prospective timeliness defense concerning trial counsel ineffectiveness claims that Petitioner anticipates later pleading by a second amended petition whereby he shall raise such claims via the equitable rule set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012), concerning the deficient performance of state post-conviction counsel. Further, Petitioner hereby reserves his right to respond on reply or traverse to any arguments that the State may assert in any responsive pleadings or adjudicative motion practice pursuant to, *e.g.*, Fed. R. Civ. P. 56. *See* 28 U.S.C. § 2243; Rule 5(e), Rules Governing § 2254 Cases in the District Courts ("Habeas Rules").

Section 2254(d) applies to federal court review of claims that have been "adjudicated on the merits in state court." *Harrington v. Richter*, 562 U.S. 86 (2011). Whether a given claim has been adjudicated on the merits is to be determined on a claim-by-claim basis. *See generally*, *Fielder v. Varner*, 379 F.3d 113, 118 (3d Cir. 2004) (Alito, J.) (application of statute of limitations is claim-by-claim inquiry) (*adopted by Decoteau v. Schweitzer*, 774 F.3d 1190, 1192 (8th Cir. 2014); *Turner v. Brown*, 845 F.3d 294, 297 (7th Cir. 2017).

Further, due to the ineffective representation of state post-conviction counsel, some claims may derive from or otherwise contain allegations *not* presented to the South Carolina courts and, as such, unadjudicated for purposes of § 2254(d). *Cullen v. Pinholster*, 563 U.S. 170 (2011). However, such deficient performance in South Carolina's initial-review collateral proceedings readily affords an equitable exception to procedural default and the requisite cause and prejudice for this Court to adjudicate the given claim. *Martinez*, 566 U.S. at 17 *Gray,* 806 F.3d at 789 (4th Cir. 2015).

Respondent may assert various defenses, procedural or otherwise, that implicate §

2254(d) and thereby necessitate a reply pleading setting forth, for instance, the factual bases for

Petitioner to overcome such defenses, and beyond such pleadings, the parties will require the

opportunity to brief the law applicable to the claims as well as the procedural rules and doctrines.

### B. Fact Development Procedures Under Habeas Rules 6, 7, and 8

In the ordinary course after the pleadings stage and briefing, Petitioner will be able to

seek discovery under Habeas Rule 6 by establishing "good cause" for full development of the

factual allegations supporting one or more claims. *See generally Bracy v. Gramley*, 520 U.S.

899, 908-09 (1997). Further, the need for record expansion pursuant to Habeas Rule 7(a) may

emerge at this juncture. *See, e.g.*, *Wellons v. Hall*, 558 U.S. 220, 226 (2010). On the record

before the federal habeas court (whether expanded or otherwise), Habeas Rule 8 contemplates an

evidentiary hearing when necessary for determining Petitioner's claims for relief. *See, e.g.*,

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). An evidentiary hearing may be necessary in

order to permit a petitioner to establish specific evidence to support avoidance, traverse, or

exceptions when a federal habeas court determines that the State has met its pleading burden for

a procedural defense (e.g., non-exhaustion). *See Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013);

*Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980); *Schlup v. Delo*, 513 U.S. 298, 332 (1995).

### C. Application of AEDPA

Title 28 of the U.S. Code empowers the Court to grant a writ of habeas corpus when it

finds a "violation of the Constitution." § 2254(a). Constraints on this power have long existed.

*See, e.g.*, *Ex parte Bollman*, 8 U.S. 75 (1807). In enacting the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), Congress effectuated certain tectonic shifts "with respect to any

claim that was adjudicated on the merits in state court proceedings." § 2254(d). Specifically, relief

> shall not be granted . . . unless the adjudication of the claim—
>
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).

In making any such § 2254(d) determination upon a constitutional claim for relief, the Court must look to "the last reasoned state court decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The only state court decision appertaining to Carr's claims presented in his direct appeal is, of course, the Mississippi Supreme Court's opinion affirming the Quitman County judgment rendered by Alcorn County jurors. *Carr I*, 655 So.2d 824.

Post-conviction review was devoid of any opportunity for evidentiary development by virtue of the Supreme Court of Mississippi's denial of leave for Carr to return to the trial court where he could obtain judicial process in relation to admissions, disclosures, discovery and other means to record development for any per se post-conviction claims. *Carr II*, 873 So.2d at 1007. Thus, the state supreme court's 2004 opinion posits the only explained decision relating to Carr's post-conviction claims. *Id.* During those post-conviction proceedings, however, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), thereby precipitating litigation as to Carr's eligibility for the death penalty under the Eighth Amendment. *Id.* at 1006-07. (Those proceedings, addressed in *Carr III*, 196 So.3d 926, and *Carr IV*, 283 So.3d 18, concern the trial court's adjudication of *Atkins* and the state supreme court's review thereof. Given that particular case history, this corresponding appellate review is purely that, as opposed to post-conviction review.)

As set forth below, Carr's post-conviction proceedings were grossly inadequate. The implications are considerable for Petitioner's present constitutional claims in this Court stemming chiefly from the ineffective assistance of counsel in connection with *Atkins* and with respect to the development and presentation of mitigation evidence.

First, the state-court decision was founded upon "'a materially incomplete record'" and thus Carr's claims were "not 'adjudicated on the merits.'" *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (quoting *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012). As a result, the strictures of § 2254(d) do not apply to this Court's determination of the affected post-conviction constitutional claims, as specified herein (*infra*), and the Court's review of his claims is *de novo*, without consideration—let alone deference—to the state court's adjudication.

Second, the state judiciary *caused* this material incompleteness of the post-conviction record by their denial of process, essentially globally, and the broad insufficiency of resources for investigative and expert services. Years after the Mississippi Supreme Court decided Carr's post-conviction claims, *Carr II*, 873 So.2d 991 (remanding in 2004 for proceedings under *Atkins*), it enunciated the entitlement, derived by statute, to the effective assistance of post-conviction counsel. *Grayson v. State*, 118 So.3d 118, 126 (Miss. 2013). The judiciary's prior failure to exercise its supervisory role had thus deprived Carr of effective representation in his "initial-review collateral proceedings." *Martinez*, 566 U.S. at 5.

A third major implication results from the grave inadequacy of Carr's state-court post-conviction process. In this context of Petitioner's deprivation of a full and fair hearing at the state level on his enumerated claims based upon the Sixth, Eighth, and Fourteenth Amendments, the operation of AEDPA would violate the Suspension Clause. Const. Art. I § 9, cl. 2. Specifically, on this record, § 2254(d), vis-à-vis the limitations on federal court fact development pursuant to

*Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (holding that review under § 2254(d)(1) "is limited to the record in existence . . . before the state court"), cannot be construed to preclude evidentiary development in this Court without running afoul of the Suspension Clause. As noted in *Boumediene v. Bush*, "the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings." 553 U.S. 723, 781 (2008) (applying Suspension Clause to invalidate Military Commissions Act of 2006 section purporting to deny habeas jurisdiction to enemy combatants detained at Guantanamo Bay).

The present federal habeas corpus proceedings must accord Carr "a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." *Id.* at 779. The state-court record at bar thus now entitles Carr to full factual development and a full and fair hearing in this Court. Const. Art. I, § 9, cl. Under these circumstances, where Petitioner had demonstrated the utmost diligence in pursuing his state-court process, he is entitled under *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000), to evidentiary development under §2254(e) concerning an array of his post-conviction claims.

Petitioner does not have the burden to prove that § 2254(d)'s bar is inapplicable or satisfied. On its face, § 2254(d) allocates no burden to the parties, whereas, in contrast, other AEDPA provisions do,[1] including (d)'s companion provision of (e)(1).[2] These repeated, explicit allocations of burdens of proof to the petitioner in other parts of AEDPA, and especially (e)(1), show Congress's intent *not* to assign any such burden to petitioners. *See Lindh v. Murphy*, 521 U.S. 320, 330, 344 (1997).

---

[1] Sections 2244(b)(2), 2244(c), 2253(c)(2), 2254(e)(1), 2254(e)(2), and 2254(f) specifically state the habeas applicant has the burden of satisfying each of those provisions.

[2] The Supreme Court has granted *certiorari* to resolve the interplay between §§ 2254(d)(2) and (e)(1) on three occasions but, in the end, has yet to resolve their interplay. *See Brumfield v. Cain*, 576 U.S. 305, 322 (2015).

### 1. Process

AEDPA imposes a "highly deferential standard for evaluating state-court rulings." *Pinholster*, 563 U.S. at 181. However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*). "AEDPA does not require a federal habeas court to adopt any one methodology." *Lockyer v. Andrade*, 538 U.S. 63, 71(2003). However, the Supreme Court has consistently considered the merits of the petitioner's constitutional claim first and then proceeded to a close reading of the state court's decision. *See* Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.3 at 1930-31 (7th ed. 2017).

That approach makes sense. "[I]t will often be most logical and efficient for a federal court to adjudicate a habeas corpus claim by first performing the Court's traditional function of analyzing the merits of the federal constitutional claim. . . ." *Id.* A federal habeas court need not conduct § 2254(d) review of a claim that fails to assert the denial of a constitutional right as required by § 2254(a). And the court cannot know whether a claim was adjudicated on the federal merits, or whether the state court decision was contrary to the governing rule, unless it first determines what the federal rule is, and compares that to the state court's reasoning. Further, the court cannot know whether a factual determination was reasonable without examining the circumstances in which it was made. *See*, *e.g.*, *Brumfield*, 576 U.S. 305, 313 n.3, 2277-81.

Thus, Petitioner respectfully requests this Court exercise its discretion to use a similar methodology that does not abdicate review but engages fully with the record and the law.

### 2. "adjudicated on the merits"

The threshold question for application of § 2254(d) is whether the state court has

"adjudicated" the federal claim "on the merits." A claim is "adjudicated on the merits" only when a "'*court* ... [has] heard and *evaluated* the evidence and the parties' substantive arguments'" and ruled "based on the intrinsic right and wrong of the matter." *Johnson v. Williams*, 568 U.S. 289, 302-03 (2013) (quoting *Adjudication*, Black's Law Dictionary (9th ed. 2009)) (emphasis added). Where a state court has adjudicated "some but not all claims" on the merits, federal courts may presume that the state court adjudicated the unaddressed claims, but this presumption is rebuttable. *Id.* at 298, 300-01.

The presumption applies only "in the absence of any indication or state-law procedural principles to the contrary." *Johnson*, 568 U.S. at 298 (quoting *Harrington v. Richter*, 562 U.S. 86, 99 (2011)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100.

### a. A claim that fundamentally alters the facts or law in support of a claim presented in state court is not adjudicated.

A claim raised in the federal petition has not been adjudicated on the merits if the claim differs from that presented to the state courts. *Johnson*, 568 U.S. at 302–03. For example, where the federal petition "fundamentally alter[s]" the claim actually adjudicated by the state court. *See Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986); *Pinholster*, 563 U.S. at 187 n.11 (2011); *Moore v. Quarterman*, 491 F.3d 213, 220 (5th Cir. 2007). In these circumstances, the claim is "new" and unexhausted as pleaded in federal court, and not subject to § 2254(d).

### b. The presumption of adjudication may be rebutted for other reasons.

In addition, *Johnson* provided a "non-exhaustive list" of explanations that would serve to rebut the presumption of adjudication, including, where a state court: (1) may have "inadvertently overlooked" the federal claim, 568 U.S. at 303; (2) applied a state standard that is "in at least some circumstances . . . less protective" or "quite different from the federal standard,"

*Id.* at 301 (emphasis in original); (3) or disregarded the federal claim based upon a belief that the federal claim was not fairly presented, *Id.* at 302–03. *See Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 282-83 (3d Cir. 2018). If a petitioner shows that one of these reasons explains the failure to address the claim, then § 2254(d) no longer applies to the claim.

### 3. Section 2254(d)(1) & (2)

If § 2254(d) applies, the district court must conduct an exacting, rigorous inquiry. "Deciding whether [the] state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected [the] state prisoner's federal claims.'" *Wilson*, 138 S. Ct. at 1191-92. The federal habeas court "reviews the specific reasons given by the state court," *Id*. at 1192, and should not "imagine what might have been the state court's supportive reasoning," *Id*. at 1195. A federal court may not apply deference to the many reasons the state court did not use. *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

For claims governed by multi-prong rules, a state court's unreasonable application of federal law on any one prong of the rule is sufficient to satisfy section 2254(d)(1) for state court rulings on any other prongs. *See Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007). Section 2254(d) review must be based on the state court record. *See Pinholster*, 563 U.S. at 181.

### a. Review under §2254(d)(1)

Section 2254(d)(1) allows a habeas remedy for adjudicated claims if a court finds the adjudication "resulted in a decision that was contrary to or involved an unreasonable application" of clearly established Supreme Court law. These two prongs have independent force.

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *(Terry) Williams*

*v. Taylor*, 529 U.S. 362, 405 (2000); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (finding state court applied rule "contrary to" clearly established law).

The "unreasonable application" prong "does not require . . . some nearly identical factual pattern before a legal rule must be applied." *Panetti*, 551 U.S. at 953 (internal quotation marks and citation omitted). "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Id.* (citation omitted).

### b. Review under § 2254(d)(2)

An "unreasonable determination of the facts" may be in a state court's findings of fact and conclusions of law on the merits. *See, e.g.*, *Miller-El II*, 545 U.S. at 236-37; *Brumfield*, 576 U.S. at 307 ; *Guidry v. Dretke*, 397 F.3d 306, 325–27, 329 (5th Cir. 2005). Section 2254(d)(2) is satisfied where a state court merits determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. In addition, a factual determination infected by an erroneous legal standard is unreasonable. *McManus v. Neal*, 779 F.3d 634, 660 n.12 (7th Cir. 2015); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

Finally, § 2254(d)(2) operates independently from § 2254(e)(1). It is wrong "to merge the independent requirements of §§ 2254(d)(2) and (e)(1)." *Miller-El I*, 537 U.S. at 341. "AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." *Miller-El I*, 537 U.S. at 341.

Section 2254(e)(1) should be addressed at the fact-development phase of the litigation. Unlike (d)(2), (e)(1) is not limited to the state court record.

## III. GOVERNING SIXTH AMENDMENT JURISPRUDENCE

Several of Petitioner's claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, which enunciated the standard governing claims of ineffective assistance of

counsel in violation of the Sixth and Fourteenth Amendments.[3] In order to minimize repetition, Petitioner presents an overview of the test here. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Performance is "measured against an objective standard of reasonableness, under prevailing professional norms." *Rompilla*, 545 U.S. at 380 (internal quotation marks and citations omitted). Prejudice requires that Petitioner show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[B]oth the performance and prejudice components … are mixed questions of law and fact." *Id.* at 698.

## A. THE PERFORMANCE PRONG

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. But that does not mean review is standardless. Counsel is assigned "the overarching mission of vigorous advocacy of the defendant's cause." *Id.* And counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688.

"Prevailing norms of practice as reflected in" codified standards are "guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. One such codified norm concerns defense counsel's "duty to investigate." *Id.* at 690. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Capital defense counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 523 (quoting *Williams*, 529 U.S. at 396). "In judging the defense's

_____

[3] All claims set forth herein sounding in the ineffectiveness of trial counsel are hereby explicitly raised under the Sixth and Fourteenth Amendments. Claims concerning the ineffective assistance of *appellate* counsel, pursuant to the *Douglas v. California*, 372 U.S. 353 (1963), line of cases also hereby explicitly invoke the Sixth and Fourteenth Amendments.

investigation … hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, 466 U.S., at 689, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*). "[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. The lodestar for performance, "as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690.

Because of that focus on the functioning of the adversarial process, reviewing courts should make "every effort to view the facts as a *defense* lawyer would have at the time." *Rompilla*, 545 U.S. at 386 (emphasis added). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. So, "courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Richter*, 562 U.S. at 109 (quoting *Wiggins*, 539 U.S. at 526-27).

### B. THE PREJUDICE PRONG

"An ineffective assistance claim asserts the absence of one of the crucial assurances that the proceeding is reliable." *Strickland*, 466 U.S. at 694. An ineffectiveness claim "is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* at 697. Accordingly, the prejudice standard is "somewhat lower" than the standard applied to a "presumptively accurate and fair proceeding." *Id.* at 694. A petitioner need *not* show that "the errors of counsel … by a preponderance of evidence … determined the outcome." *Id.*

The prejudice inquiry for ineffectiveness claims mirrors the materiality analysis under *Brady v. Maryland*, 373 U.S. 83 (1963). *Strickland*, 466 U.S. at 694. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court identified other aspects of the prejudice/materiality test that bear mention here. First, *Kyles* echoed *Strickland* in noting that prejudice does not require that "the defendant more likely than not would have received a different verdict." *Kyles*, 514 U.S. at 434. *Cf. Strickland*, 466 U.S. at 693 ("defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). Still, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Second, prejudice "is not a sufficiency of the evidence test," such that prejudice exists even if there remains enough evidence to convict or produce a death sentence. *Kyles*, 514 U.S. at 534-35. Third, *Kyles* repeatedly emphasized that the prejudice/materiality analysis requires that the evidence be viewed cumulatively. *See id.* at 436 (after noting identity between *Strickland* prejudice and *Brady* materiality, explaining that, "[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item."). Thus, *Strickland*'s prejudice test requires the Court to consider all of trial counsel's unprofessional errors against "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397. Courts must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, 466 U.S. at 695-96.

> Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 696.

The Supreme Court has further clarified the prejudice test by rejecting as unreasonable under § 2254(d)(1) state court determinations that "discount entirely the effect that [post-conviction] testimony might have had on the jury." *Porter v. McCollum*, 558 U.S. 30, 43 (2009). *See also Smith v. Cain*, 565 U.S. 73, 76 (2012); *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016). Additionally,

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Strickland*, 466 U.S. at 695.

In the context of a capital sentencing proceeding, the question is whether "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the petitioner's] culpability." *Rompilla*, 545 U.S. at 393 (internal quotation marks and citations omitted). The application of the legal standard includes all constitutionally admissible evidence. *See Sears v. Upton*, 561 U.S. 945, 950 & n.6 (2010) (faulting state court for failing to consider effect of *Green v. Georgia*, 442 U.S. 95 (1979) (*per curiam*), on prejudice inquiry). Under *Wiggins*, the question is whether "there is a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 537; *Buck v. Davis*, 137 S. Ct. 759, 776 (2017). Lastly,

> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.

*Strickland*, 466 U.S. at 695.

## IV. STATEMENT OF THE CASE

*Introduction*

Saturday, September 19, 2020, will mark thirty years since the State of Mississippi remanded Petitioner, Anthony B. Carr, then 25 years old, from the Alcorn County Courthouse in Corinth to the Mississippi State Penitentiary at Parchman Farm to await the execution of his

death sentence from a conviction of four counts of capital murder. Carr had been convicted and sentenced to death in September 1990 for playing a non-principal role in the robbery and killings of the Parker family at their home on the outskirts of Quitman County.

But Mr. Carr is among the people whom the Federal Constitution categorically exempts from the death penalty in recognition that it is "reserved for those whose culpability is greatest." *Tison v. Arizona*, 481 U.S. 137, 171 (1989) (Brennan, J., dissenting). What is more, Carr belongs within *two* exempt categories. First, Carr is intellectually disabled, as explicitly evidenced at his 1990 trial—twelve years before the Supreme Court's landmark decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). In the liability phase of his trial, a clinical psychologist testified that Carr was "mildly mentally retarded" on the basis, inter alia, of a full-scale IQ score of 70, school history of failing third, seventh, and ninth grades before dropping out on his second attempt at ninth grade, and a reading level in the 0.8 percentile. After a 2004 remand pursuant to *Atkins*, the trial court heard yet further evidence of Carr's intellectual disability, including crucial findings from *the State's* own team of experts from the Mississippi State Hospital at Whitfield. They averred: "Mr. Carr does, in our opinion, have intellectual limitations and may very well have met the diagnostic criteria for mental retardation before the age of 18." Second, the State's evidence against Carr, even if credited, fails to meet the threshold culpability for overcoming the Eighth Amendment's prohibition against the death penalty for any individual "who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used." *Cabana v. Bullock*, 474 U.S. 376, 386 (1986) (examining *Enmund v. Florida*, 458 782 (1982), abrogated on other grounds, *infra*).

Beyond these categorical exemptions from the death penalty, Carr's Quitman County judgment is the consequence of a wrongful conviction secured through State-orchestrated false

testimony introduced to overcome the lack of compelling physical or other direct evidence establishing Carr's responsibility for the capital murders in question. These proceedings are expected to demonstrate Carr's ineligibility for the death penalty under the Mississippi and Federal constitutional and procedural authorities. *See generally Sawyer v. Whitley*, 505 U.S. 333 (1992). With the eventual benefit of the ordinary operation of the Rules Governing § 2254 Cases in the District Courts ("Habeas Rules"), including, inter alia, post-petition discovery under Rule 6, this Court ultimately should determine *directly* that Carr is factually innocent of his capital charges, as well as the aggravating circumstances that the jury found, erroneously, in sentencing him to death. *See Herrera v. Collins*, 506 U.S. 390 (1993); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (observing that the question in *Herrera* remains an explicitly open constitutional matter, finding that actual innocence may overcome statute of limitations failing).

*The Crimes*

The gruesome crimes against the Parkers late on the night of February 2, 1990 shocked the entire community. It mobilized local law enforcement authorities and the Mississippi Highway Patrol and precipitated a flurry of print, radio, and television media saturation on both sides of the Tennessee/Mississippi border, which extended through the investigation and court proceedings that followed.

The Parker family was slaughtered in their home approximately between 9:00 and 11:00 p.m. The Parkers—the father, Carl, and his wife, Bobbie Joe, and their 12-year-old boy, Gregory, and 9-year-old daughter, Charlotte—were last seen alive spending their Friday night at the Riverside Baptist Church in Clarksdale, from where they embarked on the approximately fifteen-mile ride home, likely shortly before 9:00 p.m. At approximately 11:00 p.m., a passer-by driving east on rural Highway 322 saw what was the southwest corner of their home engulfed in flames.

Lambert Volunteer Fire Fighters were called and arrived shortly to extinguish the blaze. The first fire fighter on the scene, Jerry Wages, encountered an unspeakably awful scene inside the burning home. He immediately recovered the body of Carl, then returned inside and obtained the bodies of Charlotte and the young boy, Gregory. One of the first to arrive at the scene was Mississippi Highway Patrol (MHP) Investigator Bill Ellis. Testimony by Ellis and others at trial noted that Carl and Gregory were bound with their feet and ankles tied with their wrists behind their backs. The daughter, Charlotte was recovered with an apparent remnant of a binding on one of her wrists. The body of the girl was undressed from the waist down. Later, from the southwest corner of the house after the fire had been extinguished, the body of Mrs. Parker, burnt beyond recognition, was also recovered. The pathologist's evidence at trial indicated that Mr. Parker and his son were each shot twice and died from those wounds while Mrs. Parker died from a single gunshot wound. Charlotte died from smoke inhalation despite being shot three times. The State introduced evidence that Charlotte was sexually assaulted vaginally and anally.

*The Investigation*

At trial, the State's evidence against Carr was deeply flawed and insufficient even to fairly convict him as an accessory, let alone support the requisite finding for a death sentence that he had the intent for lethal force to be used—by anyone—in the crimes. It is undisputed, too, that the State failed to prove that Carr actually killed anyone. Further, it is submitted, the record objectively shows that the prosecution failed to adduce any intention of Carr to kill anyone, notwithstanding the verdict that the state supreme court affirmed on direct review.

Viewing Carr's prosecution from the broader context of the crime investigation launched in the hours immediately following the quadruple murder makes the results from Carr's trial yet more mystifying.

Law enforcement collected numerous pieces of physical evidence, much of which was submitted to the State crime lab for forensic analysis. Carr's fingerprints and specimens for a rape kit in connection with the sexual assault of Charlotte Parker were taken. Ultimately, no physical evidence linked Carr to the crime at all except for a sole fingerprint on a shotgun, which was not the murder weapon, that had been found, along with other items believed to have come from the Parkers' home, in the back of the Parkers' pickup truck, which was found parked at Robert Simon's mother-in-law's house.

Early in the investigation, MHP officer Ellis interviewed Robert Simon's wife, Martha, who would later testify against Carr. In the few weeks leading up to the crime, Carr had been living with the Simons' in their apartment in Memphis. Martha would testify that she had met Carr in Clarksdale on the night of February 2. He was looking for Robert and said he had been driving a truck with "some stuff in it" for him. Martha said that Carr told her he had put some coveralls in a dumpster and described its location. Officers later retrieved a pair of coveralls. They parted ways after Martha said she had not seen Robert. She testified that Carr came around to her mother's house early in the morning, again looking for Robert. She said she did not know his whereabouts. Then, at around 10:00 a.m., Carr showed up with Robert in Robert's truck. They talked for 10 to 15 minutes and told her that they were headed for Memphis.

On February 3, 1990, Carr and Simon were arrested in Clarksdale. Simon was ultimately tried separately, in DeSoto County, and capitally convicted of murdering the Parkers based largely upon statements given to law enforcement early during his custody in which he "confessed that he killed the Parker family." *Simon v. State*, 688 So.2d 791, 798 (1997) (affirming conviction of three counts of capital murder and death sentence in same crime).

A third suspect, Willie Lee Henderson, was also arrested on February 4, 1990 and charged capitally with the killings. He was under investigation and remained in custody for several weeks leading up to Carr's and Simon's grand jury indictment. On February 4, Henderson and Carr were both subjected to polygraph tests in Oxford. Carr passed, credibly denying participation in the murders and the rape of Charlotte Parker. Henderson, on the other hand, failed the polygraph test. *See* Doc. #11-2. Notably, Henderson had a criminal history for child rape. In September 1989, months before the Parker murders and the sexual assault of 9-year-old Charlotte, Henderson was arrested and charged with raping an 11-year-old girl in Clarksdale. For reasons unknown, those charges were ultimately dropped by the district attorney. Subsequently, Henderson was charged and convicted for a 1995 rape of his 8-year-old stepdaughter.

By early March 1990, the capital murder charges against Henderson in the Parkers' case were dropped. According to Investigator Bill Ellis, Henderson's alibi witnesses checked out sufficiently. It is unclear why Henderson's alibi witnesses were determined to be more credible than the witnesses who testified to seeing Carr during the time period that the pathologist concluded the Parkers were killed.

On February 5, 1990, Simon allegedly volunteered certain *Mirandized* statements in the presence of Investigator Ellis, along with Lt. Ken Dickerson and Jack Harrison. In his first statement, Simon disclaimed involvement in the Parker murders. He claimed that when he was about to head back home from a night out, he bumped into Carr, who told him that he had a man's and lady's ring to sell. Simon said he took the rings and went to Memphis and went to sleep. He concluded, "If I were to guess that someone who might have done it with him [meaning Carr], it might have been Willie Henderson."

Forty minutes later, Simon provided a second statement. This time, he took responsibility for killing the Parkers and indicated that he killed them with a gun he had stolen from an old lady in Winona. Simon said that he had used the same gun to kill his last victim prior to the Parkers, a drug dealer named Larry, aka Big Daddy. In this version, Simon explained that his role was part of a murder-for-hire scheme and that, in fact, he had been retained by someone to kill the Parkers and was promised "$1,500 to do the job if he could prove it was done." The names of the other people involved in the scheme were redacted in the version that the State provided to the court and the defense.

Simon's admission that he killed the Parkers was used against him at his own trial to secure his conviction for capital murder. In Carr's proceedings, however, the court did not admit in the liability phase Simon's confession that he was the killer. Through the testimony of Quitman County Sheriff Jack Harrison, Simon's statement that he had killed the Parkers, as well as his statement fingering Carr and Henderson, came in during the penalty phase.

In the preliminary hearings before the trial, the defense questioned the redactions in the copies of Simon's statement supplied to Carr. The State claimed that the redacted portions named other individuals and had nothing to do with the case. This was untrue. Only after Carr's conviction and sentence were affirmed did his post-conviction counsel obtain an unredacted version of Simon's statement.

The redacted portions reflected Simon's account that a man named Charlie Payton hired him to kill the Parkers. Payton was reputedly a drug dealer in Clarksdale who had local police officers on his payroll. Simon stated that he had already "been breaking in houses" for Payton. The State wrongfully withheld this evidence. Had the defense had Payton's name and known that

Simon had implicated members of law enforcement in the murder-for-hire scheme, they would have investigated further.

<em>Carr's Transport to Tate County Jail</em>

On February 7, Ellis had flown Carr the very short distance from Bolivar County, where he was jailed, to Jackson for another polygraph test. Henderson was also transported to the MHP headquarters in Jackson for another exam.[4] After conducting the polygraph exams in Jackson, Ellis transported Carr and Henderson back to north Mississippi. Ellis first deposited Henderson with state troopers at the Oakland Exit off of I-55, who drove him to the Tallahatchie County Jail. Rather than return Carr to Bolivar County, where Ellis had retrieved him that morning, Ellis chose to bring Carr to the Tate County Jail in Senatobia Upon depositing Carr there, Ellis's instructions reflected on Carr's Tate County Jail record states that Ellis was holding him there for the Quitman County Jail.[5]  But Ellis essentially had to drive past Marks, the county seat of Quitman, on the way to Senatobia, which is about 40 miles north and east of Marks. Already jailed in Tate County was Anthony Washington, who had spent the prior four weeks in custody there for a case on which Ellis was also the investigating officer.

On February 15, 1990, Ellis visited Washington to discuss Washington's case. Ellis reportedly asked him if he had any information on Carr. Washington then recounted confessions

---

[4] The stated purpose of the re-testing so soon after the initial exams in Oxford concerned a pair of coveralls, which Carr allegedly had claimed belonged to Henderson. MHP officer Jimmy T. Simmons administered the second tests. Simmons testified at trial that with respect to certain questions, Carr gave untruthful responses. Conversely, Simmons concluded that Henderson passed the second test. No attempt was made to compare the first and second polygraphs for either suspect.

[5] As noted in Carr's jail record reflecting when he was checked into the Tate County Jail (at 12:25 a.m.), his "OFFENSE" is listed as "HOLD FOR B 65" (Ellis's badge number is B-65), and his release to the Quitman Sheriff's Office on February 12, 1990 at 11:06 a.m. is also noted.

that Carr supposedly made to Washington, a complete stranger, within hours of his arrival at the jail just after midnight on February 8. Washington told Ellis that the morning after Carr arrived at the jail, the two men were playing a card game, during which Carr, unprompted, made a motion with his hands as though he were shooting a gun to his head, and said that "he had a ball." Later, Washington claimed that Carr came into his cell and asked him if he could talk to him "brother-to-brother." When Washington assented, Carr then asked if they could tell if he raped the little girl. Carr then allegedly confessed that his partner first raped her and then he raped and sodomized her and that "she shitted blood." Washington recalled that Carr had also said something about how his partner said they had to burn the house down for the evidence. Washington agreed to sign a written statement to this effect. *See* Doc. #11-1. Carr's counsel moved to suppress his statement before trial, which the court denied. Washington took the stand during the liability phase and related each of Carr's supposed incriminating statements to the jury. Washington's testimony was the *only* evidence placing Carr inside the Parkers' home, and the *only* evidence that Carr had been involved in the sexual assault of Charlotte Parker.

The crimes and the investigation of the suspects obtained heavy pretrial publicity, which was exacerbated severely by the district attorney's misconduct in misfiling two inflammatory documents publicly, rather than under seal, thereby transmitting to the press information that the trial court had ordered to be kept from the public domain. It became apparent to all involved that a fair jury proceeding in Quitman County was not possible and the defense sought a venue change. The trial court, however, moved the case to Alcorn, a county bearing little resemblance to the demographic makeup of Quitman, which was majority African-American. Just 4% of Carr's venire panel were African-American and the State discriminatorily used a peremptory strike against the only African-American near enough to the front of the venire to have a change

of empanelment. The result was an all-white jury to judge Carr for the quadruple murder of a white family.

*Sentencing Without Any Mitigation Investigation*

Carr's sentencing phase immediately followed his conviction on the four capital counts. Trial counsel had prepared literally no mitigation evidence.

The team could only rehash liability phase information concerning Carr's intellectual disability, putting on the stand briefly his elementary school principal, a high school counselor, and the clinical psychologist. Carr had a wealth of mitigating information from his multi-generational life history that was completely untapped due to counsel's total failure in preparing for that phase of the capital trial. *See* Doc. #11-3. The jury should have heard extensive information that would have supplied bases for exercising mercy in punishing him with a lesser sentence than death, but they were offered no background about his grinding rural poverty, exposure to agricultural toxins from the womb and throughout life, and the extensive history of abuse he suffered at the hands of family members.

*Jailhouse Snitch Recants During His Own Sentencing*

On January 7, 1991, less than four months after the Alcorn County jurors' sentencing verdict condemned Carr to death, Washington appeared in the Circuit Court of Tate County for a plea hearing. He entered a guilty plea that day in relation two Tate County causes from 1990 for which Washington was facing up to 45 years in prison. Washington's sentencing hearing would not follow until more than eleven months later, on December 13, 1991. Complicating matters for Washington was the fact that, on January 27, 1991, just 20 days after he entered a guilty plea on the two Tate County causes, he was charged with grand larceny in DeSoto County.

Those complications brought to light the fact that Ellis—the law enforcement officer responsible for securing the statement from Anthony Washington against Carr *and* for securing the statement and trial testimony of Robert Simon's wife, Martha, against Carr—had, without any doubt, secured Washington's cooperation against Carr in exchange for extreme leniency. All involved with this deal had denied its existence at the suppression hearing and when Washington ultimately testified at trial, damningly against Carr.

But the statements in open court, on the December 13, 1991 record before the Honorable George C. Carlson, Jr. manifest the existence of Ellis's deal with Washington through Washington's own testimony and the statements of *both* defense counsel, Robert M. Ryan, *and* the assistant district attorney.

When Circuit Judge Carlson questioned Washington, he explained: "All I know is when I testified for that capital murder case, that the State was going to work with me with the case I got here. How much time I was going to get, I don't know. And, what time I was going to do, I don't know." The court then asked: "You didn't know whether or not. You would get some time to serve?" Washington answered: "All I know is Bill Ellis and Mr. Mellin [sic] said they would work with me for being a State witness."

At the time of Washington's pretrial statements and trial testimony against Carr on September 14, 1990, all involved—Ellis, District Attorney Mellen, Assistant District Attorney Hill, Washington himself—had denied that Washington received any incentive for his testimony against Carr.

**V. GROUNDS FOR RELIEF**

**A. CATEGORICAL EIGHTH AMENDMENT VIOLATIONS**

NO. 1:     THE STATE COURTS' FINDINGS AND CONCLUSIONS THAT MR. CARR FAILED TO
           PROVE THAT HE IS INTELLECTUALLY DISABLED AND THEREFORE THAT THE STATE
           IS PROHIBITED FROM IMPOSING A DEATH SENTENCE UPON HIM, VIOLATED THE
           EIGHTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

At trial, counsel called a clinical psychologist, Dr. William Kallman, in Carr's liability

phase. T. 899. Months earlier, the psychologist had administered an evaluation over the course of

two days. T. 902-03. Dr. Kallman administered the Wechsler Adult Intelligence Scale-Revised

(WAIS-R), which resulted in Carr's full-scale IQ score of 70. T. 906. That score indicated Carr

had "mild mental retardation" and placed him "two standard deviations below the mean,"

meaning that "95 percent of the population would score higher on this test than" he did. T. 906-

07. Dr. Kallman also tested Carr's reading level, placing him in the "0.8 percentile," which is

about the "third or fourth grade reading level." T. 908.

Twelve years later, during the pendency of Carr's state post-conviction litigation, the

Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which established the Eighth

Amendment prohibition against the imposition of capital punishment upon the "mildly mentally

retarded,"[536 U.S. at 308 n.3] as they were then labeled. The Mississippi Supreme Court thus

remanded Carr's case to his trial court to apply *Atkins*. *Carr II*, 873 So.2d at 1007. As set forth

herein (*infra*), between 2004 and 2019, Carr's *Atkins* claim returned from the Quitman County

Circuit Court to the state supreme court twice. *Carr IV*, 283 So.3d at 20.

In the county court, the State extensively evaluated Carr. Under the auspices of the Mississippi State Hospital, the State's experts, Drs. Gilbert MacVaugh and Reb McMichael and their team, examined Carr, administering two IQ tests in short succession. *Carr III*, 196 So.3d at 935. Carr obtained a full-scale IQ score of 72 on the WAIS-IV and a full-scale score of 75 on the Stanford-Binet-5. *Id.*[6] "In terms of intellectual functioning, the State Hospital team concluded that Carr was 'at worst, functioning in the upper portion of the mild range of mental retardation; or at best, the lower portion of the borderline range of intellectual ability." *Id.* Further, "the State Hospital team said Carr '*may* have demonstrated significant limitations in at least two areas of adaptive behavior before the age of 18 (i.e., functional academics and work)." *Id.* (emphasis from opinion).

The Quitman County Circuit Court also received evidence showing that Carr had failed third, seventh, and ninth grades—on his second try at ninth grade he dropped out. *Id.* Carr's school absences were high, which was considered to be confounding in relation to assessing his academic performance. *Id.* at 935-36. But his achievement-test scores were extremely poor and highly indicative of intellectual deficits. *Id.*

Carr's state post-conviction counsel also submitted evidence after the remand, including a report of licensed psychologist, Dr. C. Gerald O'Brien, who reviewed both the pretrial test results of Dr. Kallman (but without access to the raw testing data), and the State Hospital team's

---

[6] None of the three IQ tests were adjusted for the so-called "Flynn effect," which "is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population." nor was the "practice effect," which "holds that a subject who is tested more than once generally will do better on subsequent tests than on the first test. *Wiley v. Epps*, 625 F.3d 199, 203 n.1 (5th Cir. 2010) (cited in *Carr IV*, 283 So.3d at 29 (King, P.J., dissenting); *see also In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006) (describing Flynn effect adjustment).

testing, along with a 2010-administered achievement test (the Woodcock-Johnson III). *Carr III*,

196 So.3d at 938. Dr. O'Brien concluded that, "ordinarily an IQ score up to 75 is considered

significantly subaverage." *Id.* A retrospective analysis of Carr resulted in Dr. O'Brien finding

deficits in all three adaptive-skills domains. *Id.* In sum, "Dr. O'Brien found to a reasonable

degree of certainty that Carr was intellectually disabled." *Id.* But the state court had noted that

"Dr. O'Brien neither tested Carr nor evaluated him, nor did he interview any collateral sources."

*Id.*

During Carr's foregoing *Atkins* litigation, the Supreme Court issued *Hall v. Florida*, 572

U.S. 701 (2014), its first death penalty intellectual disability case since *Atkins*, followed by

*Brumfield v. Cain*, 576 U.S. 305 (2015), *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*), and

*Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*).

As set forth herein (*infra*), Carr's foregoing proceedings resulted in the Mississippi

Supreme Court's affirmance of the trial court by unreasonable, inconsistent fact determinations

and misapplications of constitutional law, despite a dissenting opinion that the case,

"[c]onsidering the totality of the evidence presented," warranted a "hold[ing]" that the trial court

clearly erred in its finding that Carr failed to prove by a preponderance of the evidence that he

was intellectually disabled within the parameters of *Atkins v. Virginia*." *Carr IV*, 283 So.3d at 28

(King, P.J., dissenting). In sum, the state courts' failure to vacate his death sentence violates the

Constitution.

In establishing the Eighth Amendment prohibition against the death penalty for those

who are intellectually disabled, *Atkins* relied on its relevant "clinical definitions" to set forth the

three elements a litigant must show: [i] "subaverage intellectual functioning" as measured by IQ

testing, [ii] "significant limitations in adaptive skills such as communication, self-care, and self-direction," and [iii] the childhood onset of these factors. 536 U.S. at 318.

*i. Intellectual functioning measurement*

*Hall* clarified the interpretation of IQ scores under *Atkins*: "[t]he professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range." 572 U.S at 712 (citing D. Wechsler, *The Measurement of Adult Intelligence* 133 (3d ed. 1944) (reporting the range of error on an early IQ test). *Hall* further explained that "[e]ach IQ test has a 'standard error of measurement," often referred to by the abbreviation 'SEM.'" *Id.* "The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. . . . [A]n individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies." *Hall*, 572 U.S. at 713. The Diagnostic and Statistical Manual 5 ("DSM-5") at 37, as quoted in *Hall*, identifies "a margin for measurement error (generally +5 points) . . . [T]his involves a score of 65-75 (70±5)." 572 U.S. at 713 (quoted in *Carr III*, 196 So.3d at 934 n.5).[7]

At bottom, an "IQ test result of 75 [falls] squarely in the range of potential intellectual disability." *Brumfield*, 576 U.S. at 315. Thus, any conclusion that a score of 75 foreclosed the

---

[7] This understanding of IQ scoring as inherently "represent[ting] a range, not a fixed number, were a fundamental premise of *Atkins*. And those clinical definitions have long included the SEM. *Hall*, 572 U.S. at 720 (citing Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987). "Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. Treating the IQ with some flexibility permits inclusion in the Mental Retardation category of people with IQs somewhat higher than 70 who exhibit significant deficits in adaptive behavior.").

presence of subaverage intelligence is plainly "an unreasonable determination of the facts." *Id.* at 316.

*Hall* had explained, "For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ scores is 75 or below, the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." 572 U.S. at 714 (quoted in *Brumfield*, 576 U.S. at 315-16). Invoking the reasoning in *Hall*, *Moore I* stated that the Supreme Court "require[s] that courts continue the [intellectual disability] inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." 137 S.Ct. at 1050.

### ii.  Adaptive deficits

*Hall* emphasized that "the relevant clinical authorities all agree that an individual with an IQ score above 70 may properly be diagnosed with intellectual disability if significant limitations in adaptive functioning also exist." 572 U.S. at 712 (quoting Brief for American Psychological Association et al., as *Amici Curiae* 15-16).

The DSM-5 explains the clinical importance of adaptive behavioral assessment: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM-5 at 37 (quoted in *Hall*, 572 U.S. at 722). The prior "statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower, *Atkins*, 536 U.S. at 309 n.5, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." 572 U.S. at 722.

The clinical criteria for intellectual disability contemplates significant deficits in just one of the three adaptive-skills domains (*viz.*, conceptual, social, or practical).[8] *Moore I*, 137 S. Ct. at 1050 (citing DSM-5 at 38). Further, "intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." *Brumfield*, 576 U.S. at 320 (quoting American Association of Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) at 8, noting that features of the crime in question "might arguably provide reason to think [petitioner] possessed certain adaptive skills").

### iii. Developmental stage onset

Onset of the functioning and skills deficits must occur during the developmental stage (childhood, before the age of 18), but may be adduced from evidence produced well into the individual's adulthood. *See, e.g.*, *Hall*, 572 U.S. at 707 (noting the consideration of seven out of nine IQ evaluations conducted in a span of 40 years); *Moore I*, 137 S. Ct. at 1041-42 (noting the consideration of six IQ scores over the petitioner's lifetime); *Atkins*, 536 U.S. at 308 n.4 (noting

---

[8] In defining "mildly mentally retarded," *Atkins* relied on the then-current definitions from the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA). Each definition underscored the importance of adaptive deficits and required impairments in two or more skill areas—a criterion the DSM-5 modified downward in 2013 to entail just one of three superordinate skill domains (conceptual, social, practical, *infra*). The AAMR contemplated "significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3, citing Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992). The APA contemplated "significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Atkins*, 536 U.S. at 308 n.3, citing DSM-IV at 41.

reliance on post-crime IQ testing, observational interviews with "deputies at the jail where he had been incarcerated for the preceding 18 months," and a review of "the statements that Atkins had given to the police and the investigative reports concerning this case."). Hall, who obtained *Atkins* relief following *Hall v. Florida*,[9] was capitally convicted in 1978 and first administered an IQ test ten years later in 1988, at the approximate age of 42 or 43 (according to corrections records, Hall was born July 21, 1945). *Hall v. State*, 742 So.2d 225, 228, 230 (Fla. 1999).

Poor school performance is typically a highly illuminating source of evidence concerning age of onset. *See, e.g.*, *Moore II*, 139 S. Ct. at 668 ("After failing every subject in the ninth grade, Moore dropped out of high school."); *Brumfield v. Cain*, Brief of Petitioner, 2015 WL 309085, at *16 (petitioner dropped out of high school in the ninth grade); *Hall v. Florida*, Brief for Petitioner, 2013 WL 6673693, at *2 ("Hall failed in school and dropped out of high school after several years of being 'socially promoted.'"); *Atkins v. Virginia*, Brief for Petitioner, 2001 WL 1663917, at *11 ("In ninth grade, his average was D+. The first time through tenth grade, it fell to D-. It stayed there in his second try at tenth grade. . . . Atkins left school without graduating.")

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

---

[9] "We also find that Hall has established the third prong [onset in developmental stage]. As noted by the United States Supreme Court, age of onset was 'not at issue' in this case. *Hall v. Florida*, 134 S. Ct. at 1994. The State's argument that a proper IQ test prior to the age of 18 is the only valid evidence to establish this prong is unjustifiable and would effectively preclude a finding of intellectual disability in most people born prior to a certain era. This Court has never held that in order to find an intellectual disability, the defendant must have been given a specific IQ test prior to the age of 18." *Hall v. State*, 201 So.3d 628, 637 (Fla. 2016) (vacating death sentence pursuant to *Atkins* and remanding with instructions to enter life sentence).

In Carr's case, over twelve years after the Mississippi Supreme Court granted leave to seek post-conviction relief in the trial court under *Atkins*, the state high court reviewed the Quitman County Circuit Court's findings and application of law in denying Carr relief. *Carr III*, 196 So.3d at 941-43. The supreme court reversed the trial court's ruling and remanded the "case for new factual findings applying the correct legal standard." *Id.* at 944.

*Carr III* reasoned that the trial court failed to conduct the requisite inquiry under the *Atkins* line. In assessing the IQ scores of 70, 72, and 75, the trial judge decided that his honor could not "find by a preponderance of the evidence that Carr has carried his burden of proof." 196 So.3d at 941. The trial court then reasoned thusly: "**While this finding alone is sufficient to deny Carr's claim of mental retardation**, because of the significance of this decision, the court will consider the other two remaining factors." *Id.* (emphasis from opinion). *Carr III* then noted that the trial judge "found that Carr had 'demonstrated adaptive skill deficits in at least two (2) of the adaptive skill areas noted in the applicable definitions," he did not specify in which two areas he found those adaptive deficits, nor did he discuss the severity or extent of those deficits." *Id.* Further, *Carr III* ruled,

> Because the medical community's diagnostic framework recognizes that Carr's IQ between 70 and 75, coupled with severe adaptive behavior problems" could support a diagnosis of intellectual disability, the circuit judge applied an incorrect legal standard by treating Carr's IQ score alone as dispositive of this case, and by failing to balance and analyze his adaptive functioning deficits with his IQ score.

*Id.* (quotation marks omitted).

*i. Mississippi Supreme Court's opinion affirming trial court denial*

Upon the case's second remand, the Quitman County Circuit Court, the Honorable Charles E. Webster presiding,[10] reassessed the three facets of the *Atkins* inquiry (*supra*), denying relief on September 20, 2017. *Carr IV*, 283 So.3d at 20.

As to whether Carr possessed "significantly subaverage intellectual functioning," the trial court then corrected its plainly faulty prior conclusion that Carr had not met his evidentiary burden and made what the Mississippi Supreme Court deemed was "[t]he only factual finding" needed on that element, *viz.*, "that the [IQ] 'scores all fall on or within the margin of error applicable to the test.'" *Carr IV*, 283 So.3d at 26 (adjudging "the trial court properly utilized the correct legal standard, and we cannot say that its findings amounted to clear error," citing *Hall*, 572 U.S. at 723; *Carr III*, 196 So.3d at 934).

Moving to the question of adaptive-skills deficits, the trial court reversed its course from the prior finding that Carr had "demonstrated adaptive skill deficits in at least two" of the skill domains. *Carr III*, 196 So.3d at 934. In the second remand (from 2016), the trial court considered the testimony of the State's lead expert (Macvaugh) and Carr's (O'Brien), plus the single lay witness, Johnnie Chaney, a childhood neighbor of Carr's family. The trial court found that "[u]ltimately, Macvaugh agreed that Carr exhibited deficits in the areas of functional academics, employment, and perhaps social,"[11] and that "'Dr. O'Brien found deficits in all three domains and in 8 of the 10 adaptive skills' and explicitly 'addressed the areas of communication, self-direction, leisure, social, community use and work and found deficits in all such areas.'"

---

[10] The Honorable Elzy Jonathan Smith, Jr., had presided over the trial and the post-conviction proceedings through the denial reviewed in *Carr III*.

[11] The State Hospital team, in the end, demurred from "offer[ing] an opinion to a reasonable degree of psychological and psychiatric certainty," on the ultimate question of whether Carr is intellectually disabled. *Carr III*, 196 So.3d at 936.

*Carr IV*, 283 So.3d at 26. Notwithstanding, the trial court "found that Carr had not shown significant adaptive-skill deficits." *Id.*

*Carr IV* ruled that,

> [i]n sum, the trial court did as *Carr III* instructed. In weighing the testimony, the trial court considered Carr's adaptive deficits in an interrelated analysis with Carr's IQ scores and concluded that the deficits were not significant in nature. Further, because no expert employed the use of normed data, we conclude, as we did in *Chase V*, that the trial court's rejecting Dr. O'Brien's testimony and finding that Carr had not proved intellectual disability by preponderance of the evidence was not clear error.

*Id.* at 27-28.

Concerning the age of onset factor, *Carr III* indicated that in the remanded proceedings to come, "Carr also must establish manifestation before age eighteen. Because the circuit judge found that adaptive functioning deficits existed based on evidence which largely focused on Carr's academic performance before age eighteen, we instruct the trial court to review its findings on this prong upon remand." 196 So.3d at 943-44 n.10. *Chase v. State*, 171 So.3d 463, 469 (Miss. 2015) (*Chase V*), concludes, without explaining, that "the trial court did not ignore any of the testimony but weighed it," and thus "Carr failed to show by a preponderance of the evidence that he was suffering from an intellectual disability that had manifested itself prior to the age of 18."[12] *Id.* at 28.

_____

[12] *Carr III* noted that the State Hospital team, while refraining in its fifty-eight-page report from "offer[ing] an opinion to a reasonable degree of psychological and psychiatric certainty," 196 So.3d at 936, opined that "Carr does, in our opinion, have intellectual limitations and may very well have met the diagnostic criteria for mental retardation before the age of 18. However, *we cannot be certain of this because he never received intelligence testing or a standardized assessment of his adaptive functioning before age 18*." *Id.* at 936-37 (emphasis added). *Compare*, *supra* n.4, *Hall*, 201 So.3d at 637 (vacating death sentence pursuant to *Atkins* and remanding with instructions to enter life sentence).

Presiding Judge King dissented. *Id.* As noted above, he would have held "that the trial court clearly erred in its finding that Carr failed to prove by a preponderance of the evidence that he was intellectually disabled within the parameters of *Atkins*." *Id.* The three aforementioned full-scale IQ scores between 70 and 75 "established that [Carr's] IQ scores fell within the range that can indicate intellectual disability." *Id.* at 29. Further, the dissent pointed out that "Dr. Macvaugh also stated that Carr's IQ scores would have been even lower had they been adjusted downward due to the Flynn Effect." *Id.* (followed by quotation from *Thorson v. State*, 76 So.3d 667, 672 (Miss. 2011) (quoting *Wiley*, 625 F.3d at 203 n.1)).

Concerning adaptive-skills deficits, the dissent quoted from *Chase V*, 171 So.3d at 469, which itself quoted the definitions of the American Association on Intellectual and Developmental Disability (AAIDD), for the three domains of adaptive functioning (conceptual, social, practical), noting that "[f]or a diagnosis of intellectual disability, an individual must have significant deficits in one of the three adaptive functioning domains. The dissent underscored that Dr. O'Brien found that Carr's reports indicated 'significant deficits in *all three* adaptive types or domains defined by the AAIDD, and in *eight of the ten* included skill areas." *Carr IV*, 283 So.3d at 30 (emphasis in opinion). The dissent added, "the [State Hospital team's] report stated that Carr may have demonstrated significant limitations in *at least* two areas of adaptive behavior *before the age of eighteen*, functional academics and work." *Id.* (first emphasis in opinion, second emphasis added).

Presiding Judge King notes that pursuant to the 2016 remand, "the trial court wrote that 'there is no evidence that Carr was administered an IQ test prior to age 18," and highlights the caveat in the State Hospital team's report, *supra* n. 8, that they "cannot be certain [that Carr

"may very well have met the diagnostic criteria for [intellectual disability] before the age of 18"] because he never received" the requisite testing "before age 18." *Carr IV*, 283 So.3d at 32 (King, P.J., dissenting). As Presiding Judge King put it, "Carr must not be penalized because he was not given an IQ test before his eighteenth birthday." *See also supra* n.4 (*Hall v. State*, 201 So.3d 628, 637 (Fla. 2016)). With respect to onset, Dr. O'Brien's testimony concretized Carr's limits early in life, "at about the third-grade level, Carr started reaching the end of his academic potential. Carr 'reached the limit at which he could no longer keep up with the average student in that school." *Id.*

### c. Procedural Matters

The state court adjudicated this issue in two opinions to which the question of Carr's intellectual disability are dedicated. *Carr IV*, 283 So.3d 18; *Carr III*, 196 So.3d 926. The resulting denial of relief is based on unreasonable determinations of fact and is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**NO. 2:**      **MR. CARR'S *ATKINS* COUNSEL[13] PERFORMED BELOW THE STANDARD OF CARE, DEPRIVING HIM OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, VIOLATING THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

---

[13] *Atkins* was decided in the midst of Carr's post-conviction litigation and, as a result, his case was remanded to the trial court for an evidentiary hearing to entertain this claim. *Carr II*, 196 So.3d at 1067. The subsequent proceedings thus concerned the only presentation of evidence under the *Atkins* Eighth Amendment prohibition and thus a Sixth Amendment entitlement to counsel attaches to those proceedings.

### a. Statement of the Claim

On the Mississippi Supreme Court's remand to the trial court to hear evidence of Carr's ineligibility for the death penalty pursuant to *Atkins*, Carr's counsel, various attorneys from the Office of Capital Post-Conviction Counsel, performed deficiently and to Carr's prejudice. As set forth herein, the evidence before the trial court and thereafter the state supreme court (twice) *did* require relief under *Atkins*. *Supra*. As explained, the state courts erred, in contravention of § 2254(d).

While the evidence before the state courts readily satisfied the threshold for a finding of capital ineligibility under *Atkins* (as one indication, the State's team of experts from Whitfield largely conceded both Carr's subaverage intelligence and "*may* have demonstrated significant limitations in at least two areas of adaptive behavior before the age of 18," 196 So.3d at 935), counsel's performance in the development and presentation of Carr's evidence nonetheless fell below the standard of care in several vital respects.

Counsel's deficiency should not have harmed Carr because (i) the showing counsel made, largely incorporating the evidence adduced by the testifying clinical psychologist from the 1990 trial (Dr. Kallman), readily satisfied the thresholds of the diagnostic criteria concerning intellectual functioning and adaptive behavior, and (ii) the State's experts' own testing and evaluation yielded sufficient evidence to necessitate *Atkins* relief. Given the denial of relief and crediting the state courts' merits decisions, Carr's counsel's deficiency plainly prejudiced him. Counsel failed to present the evidence fully and rigorously and failed to cultivate available evidence in keeping with the prevailing diagnostic criteria and relevant legal authorities.

As set forth herein (*supra*, Section IV, at #-#), *Strickland v. Washington*, 466 U.S. 668 (1984), governs the inquiry as to the performance of counsel with respect to the *Atkins* evidentiary hearing litigation initiated pursuant to *Carr II* and reviewed in *Carr III* and *Carr IV*.

### b. Factual Grounds

The evidentiary hearing at bar included extensive school-records evidence adducing Carr's pervasive deficits captured by, inter alia, multiple grade failings and abysmal achievement test metrics. *Supra* at #-#. Carr's counsel developed scant evidence beyond those records, identifying just a single adaptive behavior witness, a childhood neighbor several years Carr's junior (Johnnie Chaney). Multiple family members appear throughout the state court record, writ large, of this case.

Apart from the lack of involvement of other witnesses able to impart observations of Carr behavior and deficits from childhood (or later), counsel failed to engage a specialist to apply an appropriate standardized assessment instrument (or standardized adaptive behavior rating scales, such as, e.g., ) in order to develop and present normed data reflecting adaptive deficits.[14] The state supreme court found fault with Carr in the lack of such evidence, citing its decision in *Chase V. Carr IV*, 283 So.3d at 27-28.

As noted in *Carr IV*, the full-scale IQ scores would have been even lower had they been adjusted for their age pursuant to the Flynn Effect. *Carr IV*, 283 So.3d at 29 (King, P.J., dissenting). While the state courts ultimately recognized that Carr's intellectual functioning fell within the mildly mentally retarded range, the measure of that subaverage functioning was likely

---

[14] Various batteries could yield such evidence dedicated to comparison across a population rather than by only anecdote or narrative. *See, e.g.*, Adaptive Behavior Diagnostic Scale; Adaptive Behavior Assessment System; Vineland Adaptive Behavior Scales.

substantially inflated because counsel failed to address Carr's data in order to arrive at a more accurate, and lower, measurement. A yet lower IQ range would, in turn, contribute to the weighing of the adaptive skills evidence.

### c. Procedural Matters

The state courts adjudicated *Atkins*, the underlying subject of this ineffectiveness claim, in its last opinion in Carr's litigation. *Carr IV*, 283 So.3d 18. The present pleading is the first opportunity Carr, through counsel, has had to challenge the performance of his counsel pursuant to the remand in *Carr II*, 873 So.2d at 1007.

**NO. 3:** **THE JURY LACKED SUFFICIENT EVIDENCE TO FIND THE NECESSARY LETHAL INTENT TO PERMIT A DEATH SENTENCE, VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

The Eighth Amendment prohibits imposition of a death sentence on "a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used." *Cabana v. Bullock*, 474 U.S. 376, 386 (1986), *abrogated on other grounds by Pope v. Illinois*, 481 U.S. 497 (1987) (citing *Enmund v. Florida*, 458 U.S. 782 (1982)); *accord Tison v. Arizona*, 481 U.S. 137, 156 (1987). The difference in culpability between a robber who kills and one who neither intends to nor carries out a killing himself is stark and constitutes an Eighth Amendment dividing line. *Enmund*, 458 U.S. at 798 ("Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the victims.").

Where the defendant did not himself kill or attempt to kill, the evidence must support, and the jury must make, a finding that the defendant "intended that a killing take place or that lethal force be used." *Enmund*, 458 U.S. at 788; *see also, e.g.*, *Tison*, 481 U.S. at 156. Imposing a death sentence on a defendant who is a minor actor in the crime and is shown to lack a culpable mental state violates the Cruel and Unusual Punishments Clause. *Id*. The paucity of evidence introduced against Mr. Carr failed to meet *Enmund*'s threshold.

*Enmund*'s constitutional requirements present a higher evidentiary bar than that for murder. *Cabana*, 474 U.S. at 390-91 (although Mississippi Supreme Court found "[t]he evidence was overwhelming that [defendant] was an active participant in the assault and homicide" and "sufficient to make [defendant] liable for the murder," U.S. Supreme Court reversed on Eighth Amendment grounds for the failure to satisfy sufficiency of evidence under *Enmund*); *Sumner v. Shuman*, 483 U.S. 66, 79–80 (1987) (A defendant's "participation may be sufficient to support a murder conviction, but in some cases it may not be sufficient to render death an appropriate sentence[.]"). The specific *Enmund* factors must be supported by sufficient and credible evidence. *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). "[U]ncertainty and unreliability in[] the factfinding process . . . cannot be tolerated in a capital case." *Beck v. Alabama*, 447 U.S. 625, 643 (1980); *see also Reddix v. Thigpen*, 728 F.2d 705, 708 (5th Cir. 1984) (reversing and remanding for resentencing where record lacked certain and reliable proof that defendant had requisite criminal intent to be sentenced to death under *Enmund*). The scant trial record here cannot satisfy the *Enmund* factors and does not support the jury's sentencing determination that the State met its burden with two such factors

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Carr's codefendant, Robert Simon, admitted that it was his gun that was used to kill the victims and that he himself killed them. T. 2875-2876. The record has no direct evidence that Carr was present when the killings took place, let alone that he intended to take life or contemplated that lethal force would be used. Indeed, the jury found, pursuant to Mississippi's statutory *Enmund* factors, Miss. Code. § 99-19-101, that Carr neither killed nor attempted to kill. However, the State also offered no proof at trial that would support the jury's findings that Carr intended that a killing take place or contemplated that lethal force would be used.

The only evidence against Carr in this case consisted of Martha Simon's testimony, Carr's fingerprint on a shotgun, which was not the murder weapon, that was found in the back of a pickup truck along with other items belonging to the Parkers, and Anthony Washington's jailhouse snitch testimony that Carr had confessed he and his partner had raped the little girl and that his partner said they had to burn the house down for the evidence. T. 1963-1991, 2278, 2326-2344. This evidence is highly dubious.

Martha Simon was the wife of Carr's codefendant and, as such, her testimony suffers from obvious bias and lacks creditability. After the trial, Anthony Washington later admitted that he had been offered leniency by Carr's prosecutor in exchange for his testimony and explicitly recanted his trial testimony that he had neither been promised nor received any benefit for his testimony. Doc. #10-3 at 18. Washington, who was facing 45 years in prison for a string of felonies when he testified against Carr, stated that in exchange for his testimony against Carr he was told that he would receive either "probation, or a suspended sentence." *Id.*

However, even taking this evidence at face value, none of it proves that Carr intended that a killing take place, let alone that he participated in or was present for any killing. There is no evidence that Carr knew Robert Simon planned to kill the Parkers, or even that he knew Simon had a gun. *See Enmund*, 458 U.S. at 798 ("Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the victims.").

As in *Enmund*, Carr played at most a minor role in the Parker murders—by handling stolen goods after the robbery and killings occurred. And out of the several stolen items retrieved from the truck, that the State submitted only one fingerprint found on a single item underscores the State's *de minimis* evidence of any role Carr could have played, even as merely an accessory after the fact.

### c. Procedural Matters

The Mississippi Supreme Court rejected this claim, stating that the evidence placed Carr in the Parker home on the night of their murders. 655 So.2d at 839. As discussed above, the evidence that Carr was ever in the Parker home is scant and highly dubious. Even so, this is not enough to satisfy *Enmund*. The state court further reasoned that "[t]he physical evidence, most specifically the fact that the victims were bound, coupled with all reasonable inferences that can be drawn therefrom, provides a sufficient basis from which a jury could reasonably conclude that Carr intended to kill and contemplated that force would be used in these crimes." *Id.* This evidence does not satisfy the *Enmund* factors. This is general evidence regarding the robbery and treatment of the victims. It is not evidence from which a jury could conclude beyond a reasonable doubt that Carr was involved. Under *Enmund*, "the punishment must be tailored to [the defendant's] personal responsibility and moral guilt." 458 U.S. at 801. Likewise, the proof

must be specific to the defendant and must demonstrate that the defendant's involvement in the crime was significant enough to satisfy *Enmund*. *Cabana*, 474 U.S. at 389–90. By holding that the evidence was sufficient to support the *Enmund* factors, the state court's affirmance of Carr's death sentence is contrary to and an unreasonable application of Supreme Court precedent and an unreasonable determination of the facts in light of the evidence presented at Carr's trial. § 2254(d).

**NO. 4:** **BECAUSE MR. CARR IS FACTUALLY INNOCENT (A) OF THIS CAPITAL CONVICTION AND (B) THE AGGRAVATING CIRCUMSTANCES THAT HIS JURY WAS ADJUDGED TO HAVE FOUND AGAINST HIM, HIS JUDGMENT VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS.**

The state supreme court affirmed this capital conviction notwithstanding the insufficiency of the evidence. *Supra*, Claim No. 3. The evidence upon which the jury convicted Carr was from predominantly self-interested, not credible witnesses. *Infra*, Claim No. 14. Carr's co-defendant, Simon, gave statements to law enforcement that supplied the basis for his conviction for the killings. *Simon*, 688 So.2d at 798. The rape of the Parker's nine-year-old daughter highly elevated the aggravation of these crimes. For a time, Willie Lee Henderson was a co-defendant with Simon and Carr but he eventually was released and his charges dropped, unceremoniously. Henderson is a convicted child rapist, having raped his eight-year-old stepdaughter in 1995, and a mere handful of months before the crime against the Parkers, he was arrested for raping an 11-year-old. If afforded the process of this Court (*supra*, Section II), Carr will develop evidence to demonstrate his the wrongfulness of the capital conviction. *See Herrera v. Collins*, 506 U.S. 390 (1993) (contemplating whether actual innocence provides a free-standing claim for habeas

relief); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (observing that the question in *Herrera* remains an explicitly open constitutional matter, finding that actual innocence may overcome statute of limitations failing).

The requisite findings in aggravation in order to impose a capital sentence under the Mississippi statute are deeply flawed. *Supra*, Claim No. 32. The development of evidence illuminating Carr's ineligibility for the death penalty under the Mississippi and Federal constitutional and procedural authorities is further anticipated. *See generally Sawyer v. Whitley*, 505 U.S. 333 (1992).

## B. PRETRIAL PROCEEDINGS

**NO. 5: THE TRIAL COURT TRANSFERRED THE CASE TO A COUNTY WITH RADICALLY DIFFERENT RACIAL MAKEUP AMONG THE VOTING AGE POPULATION THAN THAT OF THE ORIGINAL VENUE, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

The Quitman County Circuit Court transferred the case to a county in which the racial makeup of the voting age population was significantly lower than that of the county where the crime occurred, resulting in a trial by an all-white jury, and thus a conviction that violates Carr's Sixth Amendment right to a jury comprised from a fair cross-section of the community. Because of prosecutorial misconduct, and the vast quantity and publicity in this cause, fueled by the extrajudicial statements of the prosecution, the defense was virtually forced to request a change of venue. T. 1377. This request was unopposed by the District Attorney's Office. T. 1377. In making the request, the trial counsel expressed its desire to move the case to a county with a

similar racial composition to that of Quitman County. T. 1378. Despite that request, the court moved the trial to Alcorn County, which resulted in a jury panel with only 4% African-American composition. Trial counsel moved to quash the jury panel and moved, in the alternative for a second change of venue. T. 1526-27. The court denied the motion, and the case remained in Alcorn County. The jury that was eventually seated was entirely white. The court's denial of the motion to change venues violated Carr's right to a jury selected from a fair-cross section of the community.

The Sixth and Fourteenth Amendments guarantee a right to a jury selected from a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 359 (1979). In *Duren*, the Supreme Court struck down a selection system that resulted in the underrepresentation of woman in the jury pool and in the resulting empaneled jury. The Court specified the three elements of a prima facie violation of the fair cross-section requirement – all of which are met here. A defendant must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S at 364. *Duren* ruled that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 363. Further, "restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial" and "to exclude racial groups from jury service [is] at war with our basic concepts of a demographic society and a representative government." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (quotations omitted).

Carr's trial court could have selected from many counties with a comparable demographic distribution to Quitman County, but steered the case to Alcorn County instead.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The State made several extrajudicial statements to news media outlets, fueling negative pretrial publicity surrounding the case and Carr. T. 619. Further, the State misfiled two of its responses to trial counsel's motions in an open file, contrary to the court's instructions that they be filed in a sealed file. T. 658. These files were then picked up by the news media. *Id.* The court found that the district attorney had an affirmative responsibility to take steps to ensure that the responses were properly filed in the sealed file. T. 544. Due to the publicity generated by the State's actions, the court acknowledged that remedial measures were required in order to ensure a fair trial for Carr. T. 657. Therefore, the State's misconduct left counsel with no choice but to request a change of venue. T. 1377. This request was unopposed by the District Attorney's office. *Id.* The court granted the motion, and since both parties could not come to an agreement on a venue, the court stated it would set the venue. T. 1378. In making the request, trial counsel expressed its desire to have the case moved to a county with a similar racial composition to that of Quitman County. T. 1378. The court moved the trial to Alcorn County.

Shortly after the voir dire commenced, defense counsel moved to quash the jury panel. T.1524. Counsel pointed out that Quitman County, the original county in which the crime took place, had a majority black population. In contrast, the black population in Alcorn County was less than 13%, and only 6 members of 159 on the jury panel were African American (less than 4% of the panel). *Id.* Counsel argued that because the venue change was precipitated by the

State's misconduct, the defendant was at least entitled to have his case moved to a county with a comparable proportionality of black to white citizens. T. 1525. Counsel argued that the Defendant has a right to a jury of his peers, and to implicate this right would be to implicate his right to a fair and impartial jury. *Id.* In support of its alternative motion for a second change of venue, the defense proffered official 1980 census figures for voting age population by race for each Mississippi county, and pointed to counties outside the range of the two primary newspapers that had given the case publicity—namely, the Memphis Commercial Appeal and the Jackson Clarion-Ledger. T. 1526.

The documents show that in 1980, Quitman County had 3,949 whites of voting age and 3,979 nonwhites (50% white; 50% nonwhite). Alcorn County had 20,871 and 2,234 nonwhites (90.3% white; 9.7% nonwhite). This amounts to a 40.3% disparity in the number of blacks. Notwithstanding the massive disparity in Alcorn County, the trial court denied the motion, maintaining that the Jackson Clarion-Ledger was not widely circulated in Alcorn County. T. 1528. The court further reasoned that the decision to move the case to Alcorn was based on the availability of facilities in the county to handle the case. *Id.* The court opined that "a defendant is not entitled to a jury of any particular race …" *Id.* The seated jury in the case was 100% white.

### c. Procedural Matters

The Mississippi Supreme Court adjudicated this issue on direct review, *Carr I*, 655 So.2d at 839-40, rendering unreasonable fact determinations and a decision that is contrary to and an unreasonable application the constitutional authorities. § 2254(d).

**NO. 6:**     **THE TRIAL COURT FAILED TO REMEDY THE PREJUDICIAL PUBLICITY CAUSED BY PROSECUTORIAL MISCONDUCT, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

District Attorney Mellen, whose duty included ensuring a fair and impartial trial for the defendant, released prohibited information to members of the media through mis-filing two documents meant to be sealed and making comments to reporters without reasonable care, such as disclaiming that Carr was presumed innocent. T. 647, 596-97. That prosecutorial misconduct caused widespread prejudice against Carr with the public, reaching counties beyond the original trial venue. This tainted the jury pool and prompted the court to grant a venue change. *Id.* at 1528. When voir dire revealed the ineffectiveness of the venue change, the court left the issue of prejudice from pretrial publicity largely unprobed. *Id.* at 1683. The trial court took no further action to remedy this grave prejudice caused by prosecutorial misconduct, failing in its duty to provide every accused a public trial by an impartial jury, and violating Carr's Sixth and Fourteenth Amendment rights to a fair and impartial trial. *Irvin v. Dowd*, 366 U.S. 717, 721 (1961).

This impartiality is tainted by a jury pool infected with prejudice created by pretrial publicity. *Estes v. State of Tex.*, 381 U.S. 532, 536 (1965) ("Pretrial can create a major problem for the defendant in a criminal case. Indeed, it may be more harmful than publicity during the trial for it may well set the community opinion as to guilt or innocence."). Pretrial publicity creates a bias against the defendant when the public believes it is coming from a credible source, such as law enforcement involved in the case. *Irvin*, 366 U.S. at 719-20, 727 (1961) (Eight of

twelve jurors thought defendant was guilty and were familiar with the material facts and circumstances involved from press releases made by police officials before trial started).

The court may try to remedy the issue of prejudice by changing the venue, a decision that is at the discretion of the trial judge. *Ehrlichman v. Sirica*, 419 U.S. 1310, 1312 (1974). However, if an impartial jury cannot be secured in the county of present venue, "it becomes the duty of the judiciary to provide to every accused a public trial by an impartial jury, even though to do so the court must grant a second change of venue and thus contravene (the statute) [providing for only one change of venue]." *Irvin*, 366 U.S. at 721 (quotation omitted). Thus, the measure of the constitutionality of a judge's decision to change venue or stay is judged by the success in securing an impartial jury, not by distance or other factors that could reasonably reduce the risk of prejudice. *E.g.*, *Estes*, 381 U.S. at 535 (reversing defendant's conviction because of a violation of his Fourteenth Amendment rights by publicity that was not solved by a change of venue to a county 500 miles away from the original county).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The district attorney's communications with the public and news reporters amounted to prosecutorial misconduct which infected the public with prejudice against Carr, preventing a fair and impartial jury from being formed. This prejudice extended to the jury pool in Alcorn County, which was addressed but not remedied by the trial court.

The district attorney mis-filed two pretrial documents that contained more information of the circumstances, date, time, and identity of the witnesses than required. These motions were filed as unsealed when they were supposed to be sealed, and Mr. Mellen failed his affirmative

responsibility to ensure that they properly filed. T. 647, 655. The judge equated this action to releasing any statement for dissemination to members of the media, a violation of Rule 4.01 of the Uniform Criminal Rules of Circuit Court Procedures (UCRCCP). *Id.* at 654.

On examination during a motion hearing, Mr. Mellen was read Rule 3.6(a) of the Rules of Professional Conduct:

> A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicated proceeding. A statement referred to in the above paragraph, paragraph A, ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to… (6) the fact that a defendant has been charged with a crime unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

*Id.* at 574-75. The court said Mr. Mellen violated Rule 3.6 when he appeared on a televised press conference and announced the charges with explaining that the defendant is presumed innocent until proven guilty. *Id.* at 654. Also, the district attorney made comments to a reporter, Carole Lawes of *The Clarion Ledger* newspaper. *Id.* at 596-97. He was referred to in the resulting article as talking about evidence of the pickup truck and other items. *Id.* at 604. All of these actions provided prohibited information to the media and violated Rule 3.8 of the code of Professional Conduct, which places special responsibilities of "reasonable care" upon the prosecutor and persons "assisting or associated" with the prosecutor in a criminal case. *Id.* at 655.

The trial court was aware of the widespread reach of these stories, noting their presence in Pascagoula in Jackson County and Tupelo in Lee County. *Id.* at 649. The story was also picked up by *The Associated Press. Id.* The court said it would accept demographic data about potential new venues, but its emphasis for locating a new venue was one that is available for trial

starting on September 10; "I don't want this case to be moved again." *Id.* at 1388. The court said it decided to move the case from Quitman County to Alcorn County, because it had the facilities and motels needed for the docket and the jurors. *Id.* at 1528. Also, Alcorn County would avoid the irresponsible and inaccurate reporting of *The Clarion-Ledger* ("It's my understanding the only place you can even get *[T]he Clarion-Ledger* in Alcorn County is in front of the Kroger building.") (italics added). *Id.*

However, during voir dire, the court asked who had read anything about this case, and "[m]ost everybody in the courtroom" raised their hands. *Id.* at 1556. The court only followed up with the question: "Is there any of you who cannot lay aside what you've read and under your oath return a verdict based on the evidence and the law, that's your oath, anyone of you who cannot do that?" *Id.* Besides that, it relied on the general oath asked at the beginning of voir dire, whether every potential juror could lay aside preconceived opinions and return a verdict based on the testimony and evidence submitted in open court. *Id.* at 1545-47. Later, Carr's counsel asked the jurors: "You have not heard any evidence at this point, you understand that? What the lawyers say and what the newspapers say and what your friend down the street says, that's not evidence, do you understand?", and he took no responses as an affirmative answer. *Id.* at 1683.

### c. Procedural Matters

The state supreme court adjudicated this issue, *Carr I*, 655 So.2d at 842, rendering a decision based upon unreasonable fact determinations that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**No. 7:** **The Trial Court Failed to Remedy the Prejudicial Pretrial Publicity Identified During Voir Dire in Alcorn County, Violating the Sixth and Fourteenth Amendments.**

### a. Statement of the Claim

The trial court recognized the prejudice caused by pretrial publicity in Quitman County and granted the above-discussed venue change. T. 1528. However, voir dire revealed that most of the potential jurors from the Alcorn County pool had had the same media exposure as those in Quitman. Id. at 1556. During jury selection, the court asked only general questions that left the issue of prejudice from pretrial publicity largely unprobed, despite the dictates of *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). The trial court took no further action to remedy the pretrial publicity, failing to provide Carr with a public trial by an impartial jury. *Irvin*, 366 U.S. at 721.

The trial court recognized the prejudice caused by pretrial publicity in Quitman County and granted the above-discussed venue change. T. 1528. However, voir dire revealed that most of the potential jurors from the Alcorn County pool had had the same media exposure as those in Quitman. *Id.* at 1556. During jury selection, the court asked only general questions that left the issue of prejudice from pretrial publicity largely unprobed, despite the dictates of *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). The trial court took no further action to remedy the pretrial publicity, failing to provide Carr with a public trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 721 (1961).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The trial court was aware of the widespread reach of these stories, noting their presence in Pascagoula in Jackson County and Tupelo in Lee County. T. at 649. The story was also picked up by *The Associated Press*. *Id.* The Court said it decided to move the case from Quitman County to Alcorn County, because Alcorn County would avoid the irresponsible and inaccurate reporting of *The Clarion-Ledger* ("It's my understanding the only place you can even get *[T]he Clarion-Ledger* in Alcorn County is in front of the Kroger building.") (italics added). *Id.* at 1528. However, during *voir dire*, the Court asked who had read anything about this case in the news, and "[m]ost everybody in the courtroom" raised their hands. *Id.* at 1556. The Court only followed up with the question: "Is there any of you who cannot lay aside what you've read and under your oath return a verdict based on the evidence and the law, that's your oath, anyone of you who cannot do that?" *Id.* Besides that, it relied on the general oath asked at the beginning of *voir dire*, whether every potential juror could lay aside preconceived opinions and return a verdict based on the testimony and evidence submitted in open court. *Id.* at 1545-47. Later, Mr. Carr's counsel asked the jurors: "You have not heard any evidence at this point, you understand that? What the lawyers say and what the newspapers say and what your friend down the street says, that's not evidence, do you understand?", and he took no responses as an affirmative answer. *Id.* at 1683.

Four jurors were excused based on the issue of impartiality based on pretrial publicity: First, Mr. Lester Holmes was challenged for cause by Defense because of his predetermined opinion, which was granted by the Court, but he was only questioned further in chambers because of his familiarity with a witness, Investigator Ellis. *Id.* at 1552, 1591-92. Second, Mr. Chad Tapp raised his hand when asked "if there's any reason that you cannot be fair and impartial both to the State and to the defendant" and flagged his partiality from pretrial publicity

in chambers. *Id.* at 1572-73, 1585-86. His partiality was discovered by his own self-awareness, not sufficient questioning. Third, Mr. Charles Hodum raised his hand when the Court reminded the potential jurors of their oath as Mr. Carr's counsel asked whether anyone had "formed any opinion, even a little bit, as to Mr. Carr's guilt or innocence. Mr. Hodum later said in chambers that he had formed an opinion and was challenged for cause by Mr. Carr's counsel, which was granted by the Court. *Id.* at 1680, 1740. Fourth, Mr. Jimmy Bingham raised his hand and said that he had formed an opinion when the Court reminded the potential jurors of their oath as Mr. Carr's counsel asked whether anyone had "formed any opinion, even a little bit, as to Mr. Carr's guilt or innocence. He was challenged for cause by Mr. Carr's counsel, which was granted by the Court. *Id.*

### c. Procedural Matters

The state supreme court adjudicated this issue, *Carr I*, 655 So.2d at 842-43, rendering a decision based upon unreasonable fact determinations that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

## No. 8: The Trial Court Denied Mr. Carr's Request for Individual Sequestered Voir Dire, Violating the Sixth and Fourteenth Amendments.

### a. Statement of the Claim

The trial court denied counsel's pre-trial motion for a sequestered voir dire, stymieing attempts to identify prejudiced jurors following extensive pre-trial publicity. T. 598. The trial court instead ruled that it would allow each side to perform a sequestered voir dire as needed where the answers to questions might be embarrassing to jurors or prejudicial to the venire. *Id*. However, the court did not conduct any individual sequestered voir dire with prospective jurors

when asking about their ability to remain impartial. Carr was therefore not able to ensure the impartiality of his jury, most of whom were familiar with his case before the trial. As a result, Carr was convicted in violation of his Sixth and Fourteenth Amendment rights to a fair trial and due process.

The court posed several qualifying questions to the entire venire, implying that impartiality was a juror's duty. T. 1556. No jurors raised their hands when the court first asked whether anyone could not set aside impressions from the publicity, and the court did not probe further. Later in the voir dire a handful of jurors offered they might have a hard time being impartial in response to a different inquiry. T. 1572. Upon further, sequestered questioning by the court those jurors admitted they had already formed an opinion as to Carr's guilt, with some specifically mentioning the media's influence. T. 1583-85; T. 1591-92. The only jurors excused for being prejudiced by the extensive media coverage were those who later came forward in response to a general impartiality question.

Though the United States Supreme Court has recognized that constitutional fairness requires an impartial jury panel, *see Murphy v. Florida*, 421 U.S. 794, 799 (1975), *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991), stressed the wide discretion given to trial courts in conducting voir dire. *Mu'Min*, 500 U.S. at 424. That discretion inhibits post-conviction challenges to the value of the trial court's voir dire process except where that process has been perfunctory and rendered the trial fundamentally unfair. *Id*. at 431. Notably, the *Mu'Min* ruling does not apply evenly to all pre-trial publicity cases and is, as the Court later framed it, "context specific." *Skilling v. United States*, 561 U.S. 358, 444 (2010). The Court in *Mu'Min* was careful to distinguish the community impact and reach of pre-trial publicity among cases, leaving open the same question of fairness in more prejudicial circumstances. *Mu'Min*, 500 U.S. at 429. The

Court specifically cited the "presumption of prejudice" established in *Patton v. Yount*, 467 U.S. 1025 (1987) and averred that had Mr. Mu'Min's trial been infected by the "wave of public passion" that pre-trial publicity brought to Leslie Irvin's trial, Due Process would require a more thorough voir dire. *Id.*

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Before beginning jury selection Carr's trial counsel moved for an individual sequestered voir dire. The trial court declined to grant a totally sequestered voir dire, but ruled that "where it is necessary for either side we will do that." T. 598. The court did not take any such measures to root out prejudice against Carr. The court asked the initial venire a number of qualifying questions. In addressing pre-trial publicity, the court asked how many of the prospective jurors had read about the case. The court noted that "most everybody in the courtroom" indicated they had. T. 1556. The court did not ask a single juror (in public or in private) what they had read or how it had affected them. Instead, the court emphasized the responsibility of jurors to decide the case based only on the testimony and the law before asking whether the prospective jurors could be impartial:

> Again, I caution you, Ladies and Gentlemen, what you read is frequently inaccurate, and in any event, it's a responsibility of jurors to return a verdict based on the testimony that comes from this witness stand right here by this bench and then the law that the Court gives to you at the end of the case. Is there anyone of you who cannot lay aside what you've read and under your oath return a verdict based on the evidence and the law, that's your oath, anyone of you who cannot do that?

*Id.* Unsurprisingly, no jurors volunteered that they could not uphold their oath. *Id.* The trial court continued to ask the venire whether anyone had a personal interest in the outcome of the case that would affect them or whether anyone disagreed with the law such that they could

not follow it in deliberations. T. 1557-58. The trial court similarly embedded these questions with notions of civic duty and responsibilities beholden to officers of the court. Again, no prospective juror came forward to offer that they fell short of those standards. *Id*.

After an hour of voir dire the court announced to the venire that the court would give a short recess. T. 1571. Following this announcement, the court made a final, sweeping call for jurors to admit they could not be fair. T. 1572. The court, again emphasizing the venire's responsibility to "return a verdict based on the evidence and the law" asked the prospective jurors to raise their hands "if there's any reason" they could not "be fair and impartial both to the State and to the defendant," and indicated for the first time that the court would address those reasons privately in chambers. *Id*. Seven jurors raised their hands.

In chambers the trial court and counsel had an opportunity to individually voir dire the venirepersons who indicated they would have some difficulty remaining impartial for different reasons. Three of those prospective jurors specifically referenced what they had read and seen in the news and on television in explaining that they had already decided about Carr's guilt.[15]

Ms. Pamela Timbes initially offered that her husband worked in law enforcement. In chambers she explained in greater detail: "We [Timbes and her husband] have discussed, you know, we've talked about it. Of course, we see it in the paper, and of course, there's talk around the station about it and then he'd come home and then he talked to me, and, you know, of course my brother-in-law works at the station, too, you know, and we talked about it, I just don't think that I could, I don't think it would be fair. . . I already have my mind made up instead of just

---

[15] These prospective jurors were Pamela Timbes, Chad Tapp, and Lester Holmes. *See* T. 1583-1592.

going in." T. 1582-83.

Mr. Chad Tapp averred that based on his moral convictions he could not be impartial in this case. In chambers he expanded that he was in fact influenced by the media. "I just don't think I could deliver an impartial verdict on the case. Maybe if I hadn't heard anything about it, hadn't seen it on TV or whatever, I wouldn't have, you know, formed the feelings that I have, but I sit out there and I keep saying, well, you know, but I said well, I'm deceiving the Court by not saying anything." T. 1585.

Mr. Lester Holmes had indicated in open court that he knew one of the police witnesses in the case through his son who worked as an investigator. In chambers, Mr. Holmes felt comfortable to explain that he had raised his hand in response to the last question because he had "some very strong feelings about this case in view of what I have read in the newspapers, seen of [sic] the television and discussions I've had with my son." T. 1591-92.

### c. Procedural Matters

The state supreme court adjudicated this issue, *Carr I*, 655 So.2d at 843, rendering a decision based upon unreasonable fact determinations that is an unreasonable application of the constitutional authorities. § 2254(d).

## NO. 9: THE STATE EXERCISED A PEREMPTORY STRIKE IN A RACIALLY DISCRIMINATORY MANNER, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

Over trial counsel's objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), the trial court allowed the State to peremptorily strike the only African-American juror remaining at the front of the venire after excusing others for cause, resulting in a violation of Carr's Fourteenth

and Sixth Amendment rights to equal protection and a fair trial. T. 1745-47. The court responded to trial counsel's objection to this strike by reminding trial counsel that the court nearly excused this juror for cause. *Id.* at 1746. When trial counsel pointed out that the State did not challenge this juror for cause, the court admitted that it would not have granted that challenge for cause in the first place. *Id*. 1747. As such, the use of a peremptory strike in this way violated Carr's right to due process and a fair trial and is exactly the misconduct the Court's decision in *Batson* was designed to prohibit.

*Batson* time and again reinforces constitutional protections against discriminatory jury selection. 476 U.S. 79; *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019); *Foster v. Chatman*, 136 S. Ct. 1737 (2016); *Snyder v. Louisiana*, 552 U.S. 472 (2008); *Miller-El v. Dretke*, 545 U.S. 231 (2005). The jurisprudence has established

> a three-step process for determining when a strike is discriminatory: "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."

*Foster*, 136 S. Ct. at 1747 (quoting *Snyder*, 552 U.S. at 476-477).

In recently "enforce[ing] and reinforc[ing] *Batson*," *Flowers*, 139 S. Ct. 2228), the Supreme Court reversed Mississippi's denial of relief under *Batson* in a capital murder case, underscoring the consideration of "relevant facts and circumstances." *Id.* at 2235. These included a pattern of individual or contextual exclusion of jurors because of race, disparate questioning of similarly situated yet racially different jurors, and the use of peremptory challenges to strike at least one member of a racial group absent the use of peremptory challenges to strike similarly situated jurors. *Id*. When contrasting the State's treatment of similarly situated jurors, a

defendant is not required to identify jurors who match each other exactly. *Miller-El*, 545 U.S. at 291.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The significance of the State's peremptory strike of Juror 14 is evident in the context of Carr's trial. Because of the aggressive and sometimes inaccurate coverage of the case by the press, Carr reluctantly requested a change of venue. T. 543-47, 1377. This resulted in the trial moving from Quitman County to Alcorn County and from a jury drawn from a 50% white voting population to a jury drawn from an over 90% white voting population. *Carr I*, 655 So.2d at 861. Of the 159 venirepersons called in Alcorn County, only six were African American, and none made it to the final panel. *Id*. When the State used a peremptory challenge to strike Juror 14 it excluded the only remaining African-American near enough to the front of the venire to have a chance at making it onto the panel. T. 1745-47.

To make matters worse, the detrimental change of venue became necessary entirely due to the district attorney's negligent misfiling of documents and the trial court's handling of matters after that misfiling. *Id*. at 655-58, 1525. On March 6, 1990, the trial court ordered that two files be maintained in Carr's case, one opened and one sealed. *Id*. at 9-10. The trial court wanted to strike a balance between the public's and the press's freedom to gain access to newsworthy portions of this case and Carr's right to a fair trial. *Id*. at 348. Documents which might prejudice a jury if released to the press were to be kept in the sealed file. *Id*. at 491-98. District Attorney Mellen hurriedly filed responses to several motions five minutes before the Clerk's office closed before a holiday weekend. *Id*. at 529-32. He provided no instructions to the Circuit Clerk, who

filed all the documents in the opened file, where she filed nearly every document in this case. *Id*. at 532, 535. As a result, a reporter from one of the state's largest newspapers found the district attorney's responses and reported their contents. *Id*. at 532-34. The trial court scolded the district attorney, but otherwise denied Carr all relief requested and carried on with the case in its entirety. *Id*. at 658. Consequently, when it came time to select the trial jury, many members of the panel already knew details of the case and entered the courtroom with opinions formed. *Id*. at 1552-53, 1556, 1591-92, 1679.

During voir dire, the State named Juror 14 its fourth peremptory exclusion. *Id*. 1745. Defense counsel "strenuously" objected on the ground that Juror 14 was the only African-American who could plausibly make it to the final jury panel, the first step required in the *Batson* three-step process. *Id*. As a race-neutral reason for the strike, the State pointed to Juror 14's concerns about her husband's work schedule and the availability of childcare for her two children if the jury stayed in sequestration past the following weekend, fulfilling *Batson*'s second step. *Id*. Consistent with *Batson*'s third step, the trial court replied that it considered letting Juror 14 go earlier in the day for that very reason and accepted the State's race-neutral concern. *Id*. at 1745-47.

An inference of discrimination may be drawn from the State's disparate questioning of Juror 9, a similarly situated yet racially different juror. T. 1509, 1707-10. In *Flowers*, the U.S. Supreme Court said that a "State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Flowers*, 139 S. Ct. at 2249; *Miller-El*, 545 US. at 246. Here, the State alleged hardship as the reason for using a peremptory challenge to strike Juror 14, an African-American woman. T. 1745. Additional voir dire conducted in chambers centered

around Juror 14's concerns about making arrangements for the care of her children should she be sequestered. *Id.* at 1597-1601. However, Juror 9, a white female, also told the court that she did not have anyone to watch a seven-year-old child whom Juror 9 raised by herself and that her unemployed status prevented her from affording childcare. *Id*. at 1509. During further questioning in chambers, neither the State nor the trial court asked Juror 9 about this hardship. *Id*. at 1707-10. This disparate questioning is evidence that the State's stated reason for striking Juror 14 was a pretext for discrimination.

### c.  Procedural Matters

The state supreme court adjudicated this issue, *Carr I*, 655 So.2d at 844, rendering a decision based upon unreasonable fact determinations that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

### NO. 10:  THE TRIAL COURT ERRED IN ALLOWING THE STATE TO USE A PEREMPTORY STRIKE IN A DISCRIMINATORY MANNER, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.

### a.  Statement of the Claim

As set forth above, the trial court allowed the State to use a peremptory strike to remove Juror 14, the only African-American juror at the front of the venire, violating Carr's Fourteenth and Sixth Amendment rights to equal protection and a fair trial. T. 1745-47. The court supported the State's response to trial counsel's *Batson* objection by reminding the parties that the court nearly excused Juror 14 for cause of hardship earlier in voir dire. *Id.* at 1746. Mere seconds later, the court admitted that it would not have granted that challenge for cause in the first place. *Id*.

1747. Thus, the trial court's error in allowing the use of a peremptory strike in this way violated Carr's right to due process and a fair trial in clear violation of *Batson*.

The basis for this claim is the same as the previous claim, but this claim addresses the trial court's responsibility. Again, the U.S. Supreme Court relies on *Batson* time and again to reinforce Constitutional protections against unfairness during jury selection.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

As stated above, the significance of the trial court's error is most evident in the context of Carr's trial, where the circumstances leading up to jury selection drastically and detrimentally increased the racial disparity of Carr's jury. This claim incorporates the record cited in support of the previous claim. During voir dire, the State named Juror 14 its fourth peremptory exclusion. *Id*. at 1745. Defense counsel "strenuously" objected on the ground that Juror 14 was the only African American who could plausibly make it to the final jury panel, the first step required in the *Batson* three-step process. *Id*. As a race-neutral reason for the strike, the State pointed to Juror 14's concerns about her husband's work schedule and the availability of childcare for her two children if the jury stayed in sequestration past the following weekend, fulfilling *Batson*'s second step. *Id*. Consistent with *Batson*'s third step, the trial court replied that it considered letting Juror 14 go earlier in the day for that very reason and accepted the State's race-neutral concern. *Id*. at 1745-47.

In fact, the court excused four white female jurors earlier in the voir dire for cause, each of whom expressed concerns about taking care of children or, in one instance, an elderly father. *Id*. at 1593, 1595-96. In support of its *Batson* objection, defense counsel pointed out that the trial

court could have allowed Juror 14's excusal for cause in the same way it allowed the excusal of these four white jurors with similar hardships. *Id*. at 1747. However, the trial court said it would not have granted a challenge on this ground in the first place. *Id*. This statement is inconsistent with the trial court's justification in step three of the *Batson* process for accepting the race-neutral reason for a peremptory strike. *Id*. at 1745-47. Additionally, despite defense counsel's requests, the trial court never allowed Juror 14 to call her family to make arrangements for her children, which she appeared willing to do, casting further suspicion on the validity of the trial court's concern for Juror 14's hardship and Carr's rights. *Id*. at 1746.

### c. Procedural Matters

The state supreme court adjudicated this issue, *Carr I*, 655 So.2d at 844, rendering a decision based upon unreasonable fact determinations that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**NO. 11:** **JUROR INTERFERENCE, MISCONDUCT, AND BIAS OCCURRED DUE TO EXTERNAL COMMUNICATION DURING MR. CARR'S TRIAL, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

Multiple jurors stated that extrinsic information and interference occurred throughout their sequestration and hearing of Carr's case. This included a bailiff conveying, falsely, that Carr issued threats to the jurors.

"It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Mattox v.*

*United States*, 146 U.S. 140, 149 (1892). *Mattox* further provides: "Hence, the separation of the jury in such a way as to expose them to tampering may be reason for a new trial . . . subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took place. *Id.* (citation omitted). Creditable averments raising that the jury encountered undue, external influence upon it necessitates the taking of evidence to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954). Discovery and evidentiary development is properly afforded to develop claims of juror and bailiff misconduct. *Wellons v. Hall*, 558 U.S. 220, 222 (2010)

### b. Factual Grounds

In connection with post-conviction counsel's application for leave for post-conviction relief, affidavits from jurors evinced improper, tampering communication from one or more bailiffs responsible for overseeing the jurors' sequestration. Doc. #10-20 at 2 ("I remember during the trial one of the bailiff's [sic] told us that Anthony Carr had threatened to get the bailiff's gun if he was found guilty and come after the jurors."); Doc. #10-22 at 2 ("I recall that a bailiff told us about the threats Anthony Carr had made against us jurors.")

### c. Procedural Matters

The state court addressed this claim, *Carr II*, 873 So.2d at 1005-06, resulting in a denial that is based upon unreasonable findings of fact and is contrary to and an unreasonable application of Supreme Court authorities. § 2254(d).

## D. LIABILITY PHASE

**NO. 12:** **TRIAL COURT'S GRANT OF JURY INSTRUCTION S-5 CREATED AN IMPROPER PRESUMPTION OF GUILT, RELIEVING THE STATE OF THE BURDEN OF PROVING MR. CARR'S INTENT TO COMMIT THE UNDERLYING FELONIES, THEREBY VIOLATING THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.**

### a. Statement of the Claim

The trial court granted a jury instruction which instructed the jurors that they "should find defendant guilty" if they determined that he committed "any act which is an element of the crimes for which he is charged."[16] Appellate R. 863. This type of presumption is in direct violation of "the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." *Francis v. Franklin*, 471 US 307, 309 (1985).

The Due Process Clause of the Fourteenth Amendment protects individuals from a criminal conviction except upon "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 US 358, 364 (1970). The jury instruction S-5 required the jury to return a guilty verdict on an accessory theory for each crime

---

[16] The full text of the challenged instruction is as follows:

> The court instructs the jury that each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, wilfully [sic] and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to it's [sic] commission, is as much a principal as if he had with his own hand committed the whole offense; and if you believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the defendant, ANTHONY CARR, did wilfully [sic], unlawfully and feloniously do any act which is an element of the crimes for which he is charged or immediately connected with them or leading to their commission, then and in that event, you should find the defendant guilty of that crime as the case may be.

Appellate R. 863.

if they believed that Carr committed "any act which is an element of the crimes for which he is charged." This instruction failed to inform the jury that in addition to committing "any act," Carr "must possess the mens rea for the commission of the crime." *Welch v. State*, 566 So.2d 680, 684 (Miss. 1990) ("An accomplice may be convicted of accomplice liability only for those crimes as to which he personally has the requisite mental state."); *see also Malone v. State*, 486 So.2d 360, 364 (Miss. 1986); *Shedd v. State*, 87 So.2d 898 (Miss. 1956). This improper instruction created a presumption that relieved the State of its burden of persuasion with respect to Carr's intent.

The Supreme Court applies a two-part test when a criminal defendant claims that the State has shifted its responsibility for proving any element of the offense charged to the defense. The "threshold inquiry" is determining what type of presumption was created by the challenged instructions, specifically whether the presumption is mandatory or permissive. *Francis*, 471 US at 313-14; *Sandstrom v. Montana*, 442 US 510, 520-24 (1979). Mandatory presumptions violate the Due Process Clause if they "relieve the State of the burden of persuasion on an element of an offense." *Francis*, 471 US at 314 (citing *Patterson v. New York*, 432 US 197, 215 (1977)). Permissive presumptions may also violate the Due Process Clause "if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis*, 471 US at 314-15 (citing *Ulster County Court v. Allen*, 442 US 140, 157-63 (1979)).

This analysis begins by focusing on the challenged language in the jury instructions, but the Court also must analyze the jury's charge as a whole because "[o]ther instructions might explain the particular infirm language…." *Francis*, 471 US at 315. However, "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." *Id*. at 322. Additionally, the standard applied is not whether the Court or the state supreme court understands the instructions, but what a reasonable juror "*could have*

*understood*" the instructions to mean. *Id*. at 315-16 (emphasis added) (citing *Sandstrom*, 442 US at 516-17).

### b.  Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Instruction S-5, on its face and in the context of Carr's trial evidence, is susceptible to leading any  reasonable juror to believe, incorrectly, they were required to return a guilty verdict under an accessory theory without proof beyond a reasonable doubt that he acted with intent. The state court decision failing to overturn the resulting verdict was thus contrary to and involved an unreasonable application of Supreme Court authority. *Francis*, 471 U.S. at 314; *In re Winship*, 397 U.S. at 364.

### c.  Procedural Matters

The Mississippi Supreme Court ruled that, due to trial counsel's failure to contemporaneously object, this jury instruction was unpreserved and thus procedurally barred. *Carr v. State*, 655 So.2d 824, 833 (Miss. 1995) (citing *Willie v. State*, 585 So.2d 660, 680 (Miss. 1991)). However, the state court also expressly denied relief on the merits, finding that the instruction "sufficiently instructed the jurors on the element of intent." *Carr,* 655 So.2d at 833. The court explained that the instruction was saved, in effect, "when read in the context of the jury charge as a whole." *Id.*  The state court's adjudication of this claim is based upon unreasonable findings of fact and is contrary to and an unreasonable application of Supreme Court. Authorities. § 2254(d).

An adequate and independent state procedural ground may bar federal court review of a federal question. *See, e.g.*, *Michigan v. Tyler* , 436 U.S. 499, 512 n.7 (1978). The Supreme

Court's "decisions, however, stress that a state procedural ground is not 'adequate' unless the procedural rules are strictly or regularly followed." *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982) (quoting *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964)). At bottom, "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims."[17] *Id.* at 263.

Specifically, the Fifth Circuit has held that, during the relevant timeframe for our case, the Mississippi Supreme Court has "enforced [its contemporaneous objection] rule only sporadically." *Smith v. Black*, 970 F.2d 1383, 1387 (5th Cir. 1992) (denying adequate and independent state ground of contemporaneous objection regarding challenged aggravating circumstance: "We have little trouble finding inconsistent application of the contemporaneous objection bar in this context.").[18] Citing eight previous instances of the state courts refusing to apply the contemporaneous objection bar, *Smith* held that the petitioner was not prevented from bringing his claim in federal court. *Id*. at 1387, 1388.

---

[17] The Mississippi Supreme Court "has a number of times declined to invoke procedural bars" in capital cases. *Caldwell v. Mississippi*, 472 U.S. 320, 328 (1985). The Mississippi Supreme Court itself has recognized that in reviewing a death penalty case "[w]e relax enforcement of our contemporaneous objection rule." *Hansen v. State*, 592 So.2d 114, 142 (Miss. 1991); *see also Foster v. State*, 639 So.2d 1263, 1295 (Miss. 1994) (examining Eighth Amendment claim not objected to at trial in death penalty case). These authorities indicate that the Mississippi Supreme Court does not strictly apply their contemporaneous objection rule to all death penalty claims.

[18] Further, Carr's trial court's grant of the S-5 instruction was also plain error. The Fifth Circuit has long recognized that, with respect to adequate and independent state procedural grounds, the Mississippi Supreme Court has "consistently follow[ed] a policy of disregarding the rule when plain error is involved." *Hill v. Black*, 887 F.2d 513, 516 (5th Cir. 1989) (noting that prior to 1989 the Mississippi Supreme Court adequately applied their contemporaneous objection rule), cert. granted and judgment vacated, 498 U.S. 801 (1990), opinion reinstated 920 F.2d 249 (5th Cir. 1990).

Finally, even if the bar in question here could constitute an adequate and independent state ground for declining federal review of this claim, Carr may overcome this bar through a showing of cause and prejudice. *Wheat v. Thigpen*, 793 F.2d 621, 624 (5th Cir. 1986).

**NO. 13:**    **THE TRIAL COURT PERMITTED THE INTRODUCTION OF ANTHONY WASHINGTON'S MATERIALLY FALSE TESTIMONY, VIOLATING THE FOURTEENTH AMENDMENT.**

### a. Statement of the Claim

The keystone of the State's case against Carr was Anthony Washington's snitch testimony that Carr had confessed to being in the Parker house the night of the murders and raping the little girl. Without Washington, the State would have had nothing to directly link Carr to the murders. Carr moved to suppress Washington's statements, which the court denied. Washington's testimony was riddled with inconsistencies and lies. Most critically, it publicly emerged after the trial that Washington had been promised—and ultimately received—leniency by the State in exchange for his testimony. Yet Washington lied about this: first in his written statement to Bill Ellis on February 15, 1990, then at the suppression hearing before trial, and again as a key witness at trial. The State knowingly elicited this false testimony.

Some of this information was stated publicly, in Washington's sentencing proceedings about 15 months after only after Carr's trial and appeal. However, even at Washington's suppression hearing, the unreliability of Washington's testimony was patently clear. The admission of Washington's unreliable and materially false testimony violated Carr's due process rights, and the state court's factual findings that Washington's testimony was sufficiently reliable constitutes an unreasonable determination of the facts in light of the evidence presented in Carr's state court proceedings.

"[R]eliability is the linchpin in determining the admissibility of identification testimony" offered against a criminal defendant. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). This principle holds true for informant testimony as well. *Kyles v. Whitley*, 514 U.S. 419 (1995); *see also On Lee v. United States*, 343 U.S. 747, 757 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility."); *Cash v. Maxwell*, 565 U.S. 1138 (2012) (Sotomayor, J.) (statement respecting denial of certiorari of court of appeals decision holding that state court's determination that snitch testimony was truthful was unreasonable determination of the facts in light of the evidence presented). These concerns are heightened when the State fails to disclose material information concerning the informant that would be favorable to the defense. *Kyles*, 514 U.S. at 432–41 (citing, *inter alia*, *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Bagley*, 473 U.S. 667 (1985) and *United States v. Agurs*, 427 U.S. 97 (1976)). The introduction of unreliable informant testimony violates the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment. *See Manson*, 432 U.S. at 113.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Washington's testimony was full of inconsistencies and untruths. At the suppression hearing, Washington claimed both during direct and cross examination that just after midnight on February 8, 1990, on the very night that Mississippi Highway Patrol Investigator Ellis deposited Carr at the Tate County Jail[19] and within minutes of meeting Washington, Carr admitted to

---

[19] The jail records indicate that Carr was bound for the Quitman County Jail, about an hour south of Tate County. As noted herein (*infra*, Claim No. 14), Ellis had transported both Carr and Willie

killing "those folks down in Quitman County." T.1019, T.1035-1036, 1038. Washington testified

under oath at that hearing, and swore that he was providing truthful testimony. T.1017. But in

Washington's written statement to Ellis on February 15, 1990, Washington stated that Carr made

no comment regarding the Parker murders on the night he arrived at the jail. Doc. #11-1. At no

point in Washington's written statement did he ever mention that Carr admitted to killing the

Parkers. *Id*. Nor did Washington testify at trial that Carr admitted to killing the Parkers. Such an

inculpatory statement, if true, would have been the crux of the State's case against Carr, who,

after all, was on trial for capital murder. Yet the State did not ask Washington to repeat this

alleged confession at the trial. Plainly, the State declined to have Washington repeat this

statement on the witness stand because the prosecutors must have known, or at least highly

suspected, that it was false. If this statement was false—which even the State seems to have

implicitly conceded—then every other statement that Washington made about Carr's

involvement in the crime is inherently untrustworthy. Such evidence is unreliable and renders

Carr's trial unfair. *See Manson*, 432 U.S. at 113-14. The fact that the State had knowledge that

Washington was untrustworthy and nonetheless relied upon him as their star witness on

September 14, 1990 further underscores the fundamental unfairness of Carr's trial and the

unsoundness of its result. *See Kyles*, 514 U.S. at 454; *see also Maxwell v. Roe*, 628 F.3d 486, 508

(9th Cir. 2010) (perjury by jailhouse informant at murder trial deprived petitioner of his right to

---

Lee Henderson to Jackson for a second polygraph on February 7. That same night, Ellis
transported Carr and Henderson back to jail, heading north from Jackson. Ellis first returned
Henderson to the Tallahatchie County Jail. But as a matter of logistics, returning Carr to Bolivar
County would have been on the way to the Tallahatchie jailhouse in Sumner. After turning
Henderson over to the authorities in Sumner, Ellis elected not to take Carr to the Quitman
County Jail in Marks, about 25 miles due north of Sumner. Instead, Ellis transported Carr about
77 miles to the north and east, depositing Carr in the Tate County Jail at around 12:25 a.m. on
February 8, where he was jailed until February 12, 1990.

trial by jury, thus violating due process), *cert. denied sub nom Cash v. Maxwell*, 565 U.S. 1138 (2012).

During the suppression hearing on May 31, 1990, Washington also claimed that Carr told him he was from Chicago and that he had previously worked as a security guard. T.1022-1023, 1036-1037. Washington reported that Carr bragged to him about how "instead of arresting women caught for shoplifting" "he got sex from them instead of turning them in." T.1037. However, it later came out during the hearing that Carr was from Clarksdale and that he had never been a security guard. T.1036, 1044.[20] These mounting inconsistencies and inaccuracies further undermine the reliability of Washington's testimony at trial. *See Kyles*, 514 U.S. at 445-46 (emphasizing materiality of noted inconsistencies in witness testimony).

Unlike these erroneous facts about Carr's background and personal history, all the potentially corroborated facts regarding the murders, the fire, and Charlotte Parker's sexual assault were reported widely in the newspapers during the time Carr supposedly made his confessions to Washington. Indeed, Washington himself confirmed that he had just read an article about the crime the same day he met Carr. T. 1019.

Most damning of all, Washington lied about receiving a personal benefit from the State in exchange for his testimony. In statement after statement during Carr's case, Washington adamantly maintained that he was not an agent of the State, that he received no promises of any kind whatsoever regarding any benefit whatsoever, whether potential or actual, in exchange for providing this testimony against Carr. Doc. #11-1 at 5; T.1021, 1027, 1044, 2336, 2344. The

_____

[20] Notably, Washington did not include these facts in his written statement to Bill Ellis, despite affirming that, "This statement is the truth word for word." Doc. #11-1 at 5.

State wrongfully withheld from the defense that Ellis had in fact reached a deal with Washington for leniency in the witness's Tate County felonies in exchange for testimony against Carr in the Quitman County capital trial. This information, however, only became public in Washington's Tate County proceedings 15 months after Carr's death verdict and after the December 2, 1991 filing of Carr's opening brief on direct review in the state supreme court. Doc. #10-3. At Washington's December 13, 1991 sentencing hearing on the charges he was facing when he met Carr, Washington stated that in exchange for his testimony against Carr he was told that he would receive either "probation, or a suspended sentence." *Id.* at 18.[21] *Id.* Further, both Washington's public defender *and* the assistant district attorney confirmed that Ellis had made this deal with Washington. *Id.* at 15-16.

### c. Procedural Matters

The Mississippi Supreme Court adjudicated this issue, denying relief by finding that "Washington's proposed testimony [had been] a focal point of an extensive pretrial suppression hearing" and the hearing as well as "extensive cross-examination produced no evidence to indicate that Washington was offered any kind of reduced sentence in exchange for his testimony." *Carr I*, 655 So.2d at 836-37. The state court's resulting adjudication of this claim is based upon unreasonable findings of fact and is contrary to and an unreasonable application of Supreme Court authorities. § 2254(d).

---

[21] Washington further stated: "All I know is when I testified for that capital murder case, that the State was going to work with me with the case I got here. How much time I was going to get, I don't know. And, what time I was going to do, I don't know." *Id.* at 18. The court then asked: "You didn't know whether or not. You would get some time to serve?" *Id.* at 19. Washington answered: "All I know is Bill Ellis and Mr. Mellin [sic] said they would work with me for being a State witness." *Id.*

**No. 14:** **THE STATE COURT DETERMINED THAT JAILHOUSE SNITCH ANTHONY WASHINGTON'S SWORN RECANTATION EVIDENCING THAT HE HAD IN FACT TESTIFIED AGAINST MR. CARR IN EXCHANGE FOR A PROMISE TO AVOID PRISON TIME DID NOT CREATE A REASONABLE PROBABILITY OF A DIFFERENT TRIAL RESULT, VIOLATING DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.**

### a. Statement of the Claim

Recidivist felon Anthony Williams testified against Carr at trial, supplying the *only* evidence placing Carr inside the Parkers' home and the *only* evidence that Carr confessed to raping the Parkers' nine-year-old daughter. Fifteen months after Carr's Quitman County death verdict, Williams had his own sentencing hearing in Tate County wherein Williams stated that MHP Investigator Bill Ellis offered, in exchange for testimony against Carr, probation or a suspended sentence—instead of potentially 45 years in prison—on Williams's two pending felony indictments. Further, Williams's defender and his prosecutor both repeatedly confirmed the existence of Ellis's quid pro quo with Williams. Further, the assistant district attorney stated on the record that Ellis was the investigator in Williams's case, which predated Carr's case by about a month.

At Carr's trial, Williams repeatedly denied the existence of any manner of deal in exchange for his testimony against Carr. The failure of the State to disclose the existence of Ellis's deal violated Carr's right to due process.

Broadly, suppression of the evidence of a witness's deal for extreme leniency in exchange for damning testimony plainly transgresses a cornerstone of due process owed the criminal defendant. *Brady*, 373 U.S. 83. The State has affirmative duty to disclose any deal it has struck with a material witness in exchange for that witness's testimony. *Giglio*, 150-51. Even

when the State is not soliciting false evidence, it is nonetheless obligated to correct any false testimony from a witness concerning any incentive or inducement appertaining to the witness's given evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942). Impeachment evidence such as a witness's deal for leniency concerning his own criminal liability plainly constitutes "evidence favorable to an accused." *Brady*, 373 U.S. at 87. A prosecutor's failure to disclose evidence that could have been used effectively to impeach a key State's witness requires automatic reversal when, as here, the materiality of that impeachment evidence creates "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (discussing *Agurs*, 427 U.S. 97).

### b. Factual Grounds

The State's case to convict Carr of a death eligible crime hinged upon snitch testimony, as advanced in the prosecution's closing statement:

> I've got to tell you about Anthony Washington. When Anthony Washington talked to this defendant, this defendant was not talking to a law enforcement officer. . . . He said, "Man, we had a ball. We had a ball." That means that he enjoyed, he had a good time tying people up, shooting people, shooting them in the back, sexually battering a nine-year-old child anally. . . . He admitted the sexual battery, he admitted to him that they set the house on fire so there wouldn't be any evidence. He admitted it.

T. 2702-03.

Washington testified because he had an undisclosed deal with MHP Investigator Ellis for leniency concerning his own exposure to 45 years in prison. But Ellis's deal was not merely undisclosed, the State doggedly denied its existence.

As set forth herein, in the May 29, 1990 suppression hearing, trial counsel sought to suppress Washington's trial testimony. T. 897; *supra*, Claim No. 13. The prosecution asked Ellis whether he made any promises to Washington, which Ellis denied. T. 999. In the same

proceeding, trial counsel specifically asked Washington whether he received "any special treatment or special favors," to which he answered he had not. T. 1021.

At trial, on cross-examination, Washington also testified that he did not expect to benefit from testifying, T. 2342-43, and that he was not committing perjury, T. 2344. But fifteen months after Carr's death verdict, Washington's own proceedings left nothing to the imagination about why he testified.

On January 7, 1991, Anthony Washington entered a guilty plea in his two Tate County causes from 1990. Doc. #10-3. Sentencing was to be determined later. Washington's sentencing hearing was eventually held on December 13, 1991. Those proceedings must be considered with reference to the events surrounding February 8, 1990—the date when, according to Washington's statements and testimony, he met Carr, who then proceeded to intimate incriminating information about the Parkers' murders.

Ellis delivered Carr to the Tate County Jail shortly after midnight on February 8, 1990. Washington had already been jailed there since January 5, 1990. Carr arrived there after having submitted to a second polygraph the prior afternoon in Jackson.[22]

---

[22] On February 4, two days prior, both Carr and Henderson had submitted to a polygraph exams in Oxford, which George Patterson administered. T. 1182-1183. The record consistently indicates that Carr had passed the test, credibly denying participation in the killings of the Parker family and the sexual abuse of Charlotte Parker. T. 1053, 1183. Henderson, however, had failed. *Id.* A decision was then made to subject the two suspects each to a second polygraph test. The stated purpose was to examine the issue concerning a pair of coveralls, which Carr allegedly claimed belonged to Henderson. T. 1107-1108.

The second tests occurred on February 7 in Jackson at MHP headquarters. Ellis had picked up Carr from the Bolivar County Jail and placed him on an MHP flight for the short trip to Jackson for the examination. T.1058, 1180. Henderson was driven from the Tallahatchie County Jail to Jackson. MHP officer Jimmy T. Simmons administered the second tests. T. 1048. Simmons testified that with respect to certain questions, Carr gave untruthful responses. T. 1056. Conversely, Simmons concluded that Henderson passed the second test. T. 1183. No attempt was made to compare the first and second polygraphs for either suspect. *Id.*

The February 7/8 odyssey began with Ellis flying to Cleveland in order to remove Carr from the Bolivar County Jail, and then Willie Lee Henderson from the Tallahatchie County Jail, in order to transport them south to MHP headquarters in Jackson for second polygraph tests.

After conducting the polygraph exams in Jackson, Ellis left with Carr and Henderson, heading due north. Ellis first deposited Henderson at the Tallahatchie County Jail, about 132 miles north of the MHP headquarters in Jackson. (Ellis elected not to return Carr to Bolivar County, where Ellis had retrieved him just hours earlier. Cleveland is largely on the way between Jackson and the Tallahatchie jailhouse in Sumner. As a matter of logistics, returning Carr to Cleveland and then returning Henderson to Sumner would have been the expected approach.) In any event, the Quitman County Jail in Marks is about 25 miles due north of the Tallahatchie County Jail. Instead of depositing Carr there, though, Ellis drove him 77 miles north and east to the Tate County Jail—where Washington had been jailed during the prior four weeks for a case on which Ellis was the investigating officer, (Doc. #10-3 at 13).[23]

During Washington's January 7, 1991 hearing in the Tate County Circuit Court, he entered a guilty plea. A sentencing hearing would not follow until more than eleven months later, on December 13, 1991, before the Honorable George C. Carlson, Jr. Complicating Washington's sentencing on the latter date was the fact that just 20 days after he entered his guilty plea on his two Tate County causes involving auto theft, Washington was charged with grand larceny for stealing another vehicle, this time in DeSoto County, on January 27, 1991. (Like Tate, DeSoto is within the Seventeenth Judicial District.)

---

[23] As noted in Carr's jail record reflecting when he was checked into the Tate County Jail (at 12:25 a.m.), his "OFFENSE" is listed as "HOLD FOR B 65" (Ellis's badge number is B-65), and his release to the Quitman Sheriff's Office on February 12, 1990 at 11:06 a.m. is also noted.

Those complications brought to light the fact that Ellis—the law enforcement officer responsible for securing the statement from Anthony Washington against Carr *and* for securing the statement and trial testimony of Robert Simon's wife, Martha, against Carr—had, without any doubt, secured Washington's cooperation against Carr in exchange for extreme leniency.

The statements in open court, on the December 13, 1991 record before Circuit Judge Carlson, make the deal's existence plain. Not only does Washington unequivocally state the quid pro quo with Ellis, but the Assistant District Attorney, Robert J. Kelly, who was prosecuting Washington for the two Tate County and one DeSoto County felonies, and Washington's public defender, Robert M. Ryan,[24] both describe Washington's cooperation with Ellis.

Specifically, Ellis had secured Washington's trial testimony against Carr in exchange for, according to Washington, either "probation, or a suspended sentence." Doc. #10-3 at 17. Thus, Washington's testimony against Carr was given in order to avoid additional jail or prison time on the charges for which Washington was facing up to *45 years in prison*.

This deal concerning the Tate County felonies was thrown into turmoil by the subsequent DeSoto County felony, which precipitated Circuit Judge Carlson's extensive questioning about the interplay between Washington's entry of a guilty plea pursuant to his deal with Ellis and the subsequent DeSoto County indictment less than three weeks after that plea in open court.

---

[24] Approximately a decade later, Mr. Ryan would become the director of Mississippi's capital post-conviction office. He served in that role when the office represented Carr with his application for leave in the state supreme court, filed in 2001. It does not appear that Ryan (nor anyone else) ever raised this manifest conflict arising from Ryan's duties to his former client and to Carr. Given the specter of criminal liability in relation to perjury as a witness in a capital prosecution, the conflict issues were plainly substantial when the post-conviction office represented Carr.

Washington's attorney, Ryan, thus attempted to explain to the court the Ellis-Washington agreement's status prior to the wrinkle caused by the DeSoto County larceny indictment:

> [W]e had an agreement, and we relied on it, and sentencing was deferred. Of course, I'm concerned about the Tate County cases. . . . I think even today Bill Ellis is still in agreement with the agreement, as pertains to Tate County. I don't have any control over what happens in DeSoto County. But, I think in Tate County we are entitled, or should get the agreement that was made between the District Attorney in [sic] the State of Mississippi, and the defendant.

*Id.* at 15. The court then asked Ryan for his recollection of what the State would recommend for Washington in exchange for the trial testimony:

> I recall the discussion pertaining to the capital murder case, to the trial which was ultimately tried at Corinth, discussions with Bill Ellis, and I'm almost certain I passed that on to Mr. Washington, that if he would cooperate in that trial with the State, that that would be the recommendation in the Tate County cases.

*Id.* at 16. Washington then testified, "Well, it is true that they told me if I would cooperate with the case, the capital murder case, that you know, they would work with me on my case." *Id.* at 17. Washington further explained to Circuit Judge Carlson, "All I know is when I testified for that capital murder case, that the State was going to work with me with the case I got here. How much time I was going to get, I don't know. And, what time I was going to do, I don't know." *Id.* at 18. The court then asked: "You didn't know whether or not. You would get some time to serve?" *Id.* at 19. Washington answered: "All I know is Bill Ellis and Mr. Mellin [sic] said they would work with me for being a State witness."[25] *Id.*

---

[25] Circuit Judge Carlson, after discussing with the 23-year-old Washington his numerous prior felonies, then questioned him, with incredulity, about the events surrounding the DeSoto County grand larceny:

COURT:      What did you steal in the Tate County charge?
WASHINGTON: A Camero [sic].
COURT:      Okay. And you testified in a capital murder case. You've been through the system over, and over, and over again. And, then after all that, some 20 days after pleading guilty to robbery, and grand larceny, then you go out and evidently take this Mazda pickup truck . . . Tell me about what happened. [A rambling account

As pointed out above, at the time of Washington's pretrial statements and trial testimony on September 14, 1990, those involved on the State's side—Ellis, District Attorney Mellen, Assistant District Attorney Hill, Washington himself—had denied that Washington received any incentive for his testimony against Carr.

### c. Procedural Matters

The Mississippi Supreme Court adjudicated the foregoing issue in denying Carr's October 23, 2001 filed Application for Leave to File Petition for Post-Conviction Relief and Memorandum in Support Thereof. *Carr II*, 873 So.2d at 997-98. The state court's resulting adjudication of this claim is based upon unreasonable findings of fact and is contrary to and an unreasonable application of Supreme Court authorities. § 2254(d).

---

of an exchange for the keys to the truck and a U-turn made in front of the police ensued.]

COURT:       Mr. Washington, with your background, can you really stand there, and look me in the eye, and say when you got that truck you didn't know it was stolen?

WASHINGTON: (No verbal response.)

COURT:       Can you?

WASHINGTON:  No, I didn't know it was stolen. I just didn't know who it was; I knew it wasn't theirs. I just didn't know it was stolen.

COURT:       How did you know it was not theirs? You're not telling me everything, Mr. Washington. Go on, spit it out. What did you and those two guys talk about? Tell me.

WASHINGTON:  I gave him some crack for the truck.

*Id.* at 26-31. Circuit Judge Carlson then sentenced Washington to 5 years for each of the three felonies before him, running them consecutively and requiring Washington to serve a year with the other 14 years suspended. *Id.* at 32.

**No. 15:**    **THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY REGARDING INCULPATORY STATEMENTS MADE BY MR. CARR'S CODEFENDANT, VIOLATING MR. CARR'S RIGHT TO A FAIR TRIAL.**

### a. Statement of the Claim

During Bill Ellis' testimony, trial counsel, in chambers, stated that the defense wanted to bring into evidence during cross-examination Robert Simon's statement to law enforcement that he killed the Parker family, exculpating Mr. Carr. T. 2011-12. The trial court denied trial counsel's motion.

The denial of the opportunity to deny or explain information leading to his conviction constitutes a denial of due process. *Gardner*, 430 U.S. at 362. While "[t]he hearsay rule … is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact," *Chambers*, 410 U.S. at 298, the prohibition against it is subject to certain exceptions. "Among the most prevalent of these exceptions is the one applicable to declarations against interest—an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made." *Id.* at 299.

### b. Factual Grounds

Ellis' report stated that "'[Simon] shot all four victims with weapons that were taken from a burglary,'" and that "'Willie Lee Henderson may have been involved in the crime'" T. 2012 (Trial counsel quoting report by Ellis). The trial court ruled that the testimony regarding the statement was "certainly not admissible at this time" pending "some research." T. 2019-2020.

Later in the liability phase, Ellis was called again as a witness, this time by the defense. In chambers, trial counsel presented the issue as such:

whether Robert Simon made statements implicating himself as having been the person who actually killed [the Parkers] and with his own guns and possibly even implicating Willie Lee Henderson, and two, whether there was any independent corroboration of the statement that would satisfy the Court as being sufficiently reliable to admit the statement.

T. 2439. The trial court found that there were no corroborating circumstances, considering the contradictory claims Simon made in the statement, some implicating Mr. Carr. T. 2439. Trial counsel argued that the admittance of this testimony – that Simon admitted to killing the Parkers – at Simon's own capital trial was sufficient corroboration as to the reliability of the statement. T. 2444. The trial court responded that was for the jury in that case to decide. *Id.* The trial court then ruled that he found, in view of all the circumstances, Simon's statements were not made with the intent to exculpate Mr. Carr, and conflicting testimony that was excluded from trial tended to support that – and indeed conflicted with the defense's position – and as a result, the court denied the motion to introduce Ellis' testimony regarding Simon's statement. T. 2445.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 833-35, rendering a decision that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

## NO. 16: THE STATE MADE PREJUDICIAL STATEMENTS ABOUT MR. CARR'S DECISION NOT TO TESTIFY, VIOLATING THE FIFTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

During closing arguments, the prosecution made statements that implicated by insinuation Carr's decision to not testify at his own trial, improperly influencing the jury and thereby resulting in a conviction that violates Carr's right against self-incrimination under the Fifth and Fourteenth Amendments. The prosecution's statements developed a pattern of insinuation that there were no other alleged witnesses to the crime other than Carr and Simon,

that Carr knew the details of the crime, and the State did not because of his decision to not testify. These violations clearly implicate Carr's decision not to testify, and directly resulted in Carr's present conviction, which thus violates his right against self-incrimination.

The Fifth Amendment, incorporated by the Fourteenth Amendment, "forbids…comment by the prosecution on the accused's silence" at trial. *Griffin v. California*, 380 U.S. 609, 615 (1965). In *Griffin*, the Court found prosecutorial comments such as "[The victim] is dead, she can't tell you her side of the story. The defendant won't." and "And in the whole world, if anybody would know, this defendant would know," to be violative of the defendant's Fifth Amendment right. *Id.* at 611. The Court has indicated that the comments forbidden under *Griffin* include those "suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S. 308 (1976). And has stated that "'Under *Griffin* … it is improper for either the court or the prosecutor to ask to the jury to draw an adverse inference from a defendant's silence…'" *U.S. v. Robinson*, 485 U.S. 25, 33 (1988) (Quoting *U.S. v. Hasting*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring)). The Court has continued in this line, holding that "[t]he normal rule in a criminal case permits *no negative inference* from a defendant's failure to testify." *Mitchell v. U.S.*, 526 U.S. 314 (1999) (Citing *Griffin* at 614) (emphasis added).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

At the outset, the prosecutor stated "[the defense] said that the State has no eyewitnesses. They're pretty safe in saying that because they were all dead." T. 2695. Later, the State emphasized the importance of recalling testimony from the trial, stating "…you'll recall not just

what [the prosecutor or defense counsel] says, but you will be allowed to recall, as you discuss the case, the testimony of these people in making a determination as to whether Anthony Carr is guilty of four counts of capital murders." T. 2731. Continuing, the State speculated as to the number of participants in the crime, noting "…I don't know if there were three or four or five people involved, but I know two people involved because those are the two that the proof shows were involved in the capital murders of this family." T. 2732. At the conclusion of his remarks, the prosecutor emphasized:

> The State has proved beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence…It would be unfair to require the state to prove the impossible, we don't have video tape of this. And the defendant and his accomplice saw that there are no eyewitnesses in this case, there are none left…Don't let him get by with this. There are no eyewitnesses because of him, because of his accomplice.

T. 2740.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 845, rendering a decision that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).


## No. 17: THE STATE, IN RELATION TO THE STATE'S SNITCH TESTIMONY, PREJUDICIALLY COMMENTED ON MR. CARR'S RIGHT TO SILENCE, VIOLATING THE FIFTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

When the State, in closing arguments, invoked statements made by a jailhouse snitch, Anthony Washington, about what Carr allegedly told him about the crime, the district attorney pointed out that, Carr, in making such alleged statements, was not "talking to a law enforcement officer." T. 2702. This implicated Carr's right to remain silent under the Fifth and Fourteenth

Amendments, improperly suggesting that Carr had "admitted" to the crime. T. 2705. This violation of Carr's right to silence, influenced his conviction and sentence.

At trial, the "[u]se for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings" violates the Fourteenth and Fifth Amendments due process and self-incrimination clauses, respectively. *Doyle v. Ohio*, 462 U.S. 610, 619 (1976). In *Doyle*, the Court held that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id*. at 618. The Court continued that "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id*. This holding was summarized in *Wainwright v. Greenfield*: "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him…" 474 U.S. 284, 292 (1986).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

During closing arguments, the State referenced Carr's alleged statements to Anthony Washington while being held at the Tate County Jail. The prosecution referenced the fact that in making such statements, Carr was not addressing a member of law enforcement, implicating his right to remain silent.

Towards the end of the prosecutor's initial closing, he stated:

Although I'm taking a little more time than I should, I've got to tell you about Anthony Washington. When Anthony Washington talked to this defendant, this defendant was not talking to a law enforcement officer, they had been making phone calls, trying to call a girlfriend, and what's the first thing he told him? He said, 'Man, we had a ball. We had a

> ball.' That means that he enjoyed, he had a good time tying up people, shooting them in the back, sexually battering a nine-year-old child anally. … He admitted the sexual battery, he admitted to him that they set the house on fire so there wouldn't be any evidence. He admitted it.

T. 2702-2703. Later, during the prosecutor's concluding remarks, he again emphasized that "[h]e's admitted to it…we've got his own statement as to how he characterized it; he had a ball." T. 2705. By these statements, the State is clearly implicating Carr's right to silence under the Fifth and Fourteenth Amendments.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 84-445, rendering a decision that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

## No. 18: THE TRIAL COURT'S FAILURE TO EXCLUDE DR. CARLYLE'S TESTIMONY VIOLATED THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT AND MR. CARR'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

### a. Statement of the Claim

In rebuttal, the State called clinical psychologist Dr. Mona Carlyle to testify to a scientific degree of certainty—and without ever interviewing or otherwise directly observing, let alone evaluating, Anthony Carr (T. 2663)—that Carr "would be highly likely" to "reveal details of sexual behavior to Anthony Washington in the jail." T. 2660.

In order to lay a foundation for Dr. Carlyle's opinion on Carr himself—not the defense expert's report ostensibly prompting her rebuttal testimony—the State repeatedly described the version of the events as presented by the jailhouse snitch, Washington, who testified damningly against Carr (before subsequently recanting). Though the State called Dr. Carlyle purportedly to

testify as to the invalidity of Dr. Kallman's opinion, she actually bore witness about a person whom she had never met—the capital defendant—as though it were first-hand evidence.

In gaining admission, the prosecution argued that Dr. Carlyle's testimony was necessary to show that a psychologist armed with the same facts as Dr. Kallman could reach a different conclusion concerning Carr's likelihood of sharing details of his sexual behavior. But Dr. Carlyle was never armed with the same facts as Dr. Kallman because, unlike the defense expert, she never personally interviewed Carr. More crucially, Dr. Carlyle's testimony unjustifiably bolstered the State's dubious evidence, fallaciously proffering it against Carr as though it had been derived from direct observation of him.

The State's case hinged on the jailhouse snitch testimony of Anthony Washington,. which was that Carr had asked him whether they could tell from Carr's DNA sample if he had raped one of the victims in his case. To discredit testimony from Washington, trial counsel retained Dr. William Kallman, a licensed clinical psychologist, to interview Anthony Carr and opine on Carr's propensity to share personal details with a relative stranger.

Dr. Kallman testified that after conducting a number of personality tests with Carr and interviewing him multiple times, he concluded that Carr would be unlikely to share details with anyone, especially a stranger. A few hours after Dr. Kallman testified, the State identified its intention to call Dr. Carlyle in rebuttal . After merely reviewing Dr. Kallman's report over lunch,[26] Dr. Carlyle opined "based upon reasonable psychological certainty" that the record in

---

[26] The record shows that Dr. Carlyle received the report, at approximately 12:15 pm. T. 2638 (time noted in record at close of chamber conference, during which Court instructs Kallman's report be copied and provided to the State). She was called to testify later that day, sometime between 1:40 pm and before 2:45 pm. T. 2639 (going back on record after noon hour, beginning at 1:40 pm); T. 2660. Defense counsel objected to her testimony because she never interviewed

the case and the results of Dr. Kallman's report indicated Carr would be "highly likely" to disclose details of sexual behavior to Washington, a stranger in his jail cell. T. 2660

The Sixth Amendment's Confrontation Clause confers upon the accused "[i]n all criminal prosecutions, … the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. This fundamental right is obligatory upon the states under the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Clause guarantees a defendant's right to confront those who 'bear testimony' against him," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)), which precludes a surrogate witness from testifying to the results of tests or reports recorded by other witnesses. *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). "[S]urrogate testimony," whereby one individual testifies to the results of another's test, cannot "convey what [the witness who performed the test] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." *Id.* at 661.

In order to safeguard Carr's right to confront any witness against him, there necessarily had to be such a witness in the first place. But the State had no such witness to present, because Dr. Carlyle possessed no actual knowledge of Carr and, further, the State had conducted neither testing nor other evaluation of him. The State put Dr. Carlyle on the stand after having her rely solely upon Dr. Kallman's records of tests and interviews he conducted with Carr. Dr. Carlyle was not a witness to Carr in any tenable sense because she never interviewed him. As a result,

---

Carr and was not competent to give her professional opinion. T. 2648. The Court allowed the testimony within the bounds of reaching a conclusion based on Dr. Kallman's report.

her opinion should have been limited, at most, only to the reliability or validity of Dr. Kallman's tests with the information recorded therein.

The State could have avoided this Confrontation Clause problem by asking Dr. Carlyle to retest Carr, "and then testify to the results of [her] retest rather than to the results of a test [s]he did not conduct or observe." *Bullcoming*, 564 U.S. at 661. But Dr. Carlyle did not interview, evaluate, or in any sense test Carr.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Before trial, defense counsel employed Dr. Kallman to conduct a series of interviews and tests with Mr. Carr. T. 2615-16. Though Dr. Kallman testified as to his findings, trial counsel did not introduce his report into evidence. T. 2611-32. However, following Dr. Kallman's testimony, the State was provided a copy of the test results, interviews, and the report summarizing the information. T. 2633.

In rebuttal, the State called Dr. Carlyle. T. 2647. In chambers, trial counsel objected to her testimony on the grounds that the witness had "not personally interviewed the defendant and is not competent to testify to give her professional opinion concerning the defendant on the test results" provided by Dr. Kallman.[27] T. 2648. The State responded that Dr.

_____

[27] Dr. Kallman testified to the various tests he administered on the Plaintiff:

> The tests that we used, I used the Wechsler Adult Intelligent Scale, revised edition, which is the standard test used to measure IQ. I used the Wide Range Achievement Test, revised, and that is the acceptable standardized test used to measure achievement, reading level and so forth, school achievement. I used two neuropsychological screening tests, the Benton Visual Retention Test and the Dementia Rating Scale, both of those are tests that are designed to determine whether the person has some kind of organic brain dysfunction.

Carlyle's testimony would be based on Dr. Kallman's report and prior testimony that "someone else would draw the same conclusion[s]" regarding Mr. Carr. *Id*. The Court overruled the objection and permitted the admittance of Dr. Carlyle's testimony.

In the courtroom, the State submitted Dr. Carlyle as an expert in the field of clinical psychology. T.2649. Trial counsel objected in order to voir dire the witness. T. 2650. During voir dire, the defense confirmed that Dr. Carlyle had not personally interviewed Mr. Carr. *Id*. A bench conference was held to again discuss the nature of Dr. Carlyle's testimony, to which the Court stated, "[t]he only question is whether she can reach an opinion based on what she has," and that "[the Court is] going to require the State to limit her data that's been furnished to her." T. 2652. During the conference, trial counsel again objected to Dr. Carlyle's testimony on the grounds she had not personally interviewed Mr. Carr. *Id.*

The State asked Dr. Carlyle to form and express an opinion based upon (i) her education, training, and experience, (ii) Dr. Kallman's file, which was not entered into evidence, and (iii) prosecution's recitation of "facts" established by testimony of a jailhouse informant.

> Q: Dr. Carlyle, based upon your education, training and experience and upon Dr. Kallman's file and testimony which we've gone over and related to you, are you able to form an opinion based upon reasonable psychological certainty as to whether or not it is likely that the defendant, Anthony Carr, would reveal details of sexual behavior to Anthony Washington in the jail? And this is yes or no.
>
> A: Yes.
>
> Q: And what is that opinion, please?

_____

> Then I used the Minnesota Multiphasic Personality Inventory, which is the most widely used and accepted personality test in psychology, and the Basic Personality Inventory, which is a newer and refined objective Personality Inventory.

T. 2615-16.

A: That he would be highly likely to.

T. 2660 at 17-27.

In the State's liability phase closing, counsel argued:

> Dr. Kallman then took the stand and said that it was his professional opinion that Anthony Carr, that the defendant was not likely to give details of his sexual behavior to anybody, especially strangers. Well, sorry Dr. Kallman, you missed this one because not likely is not what we're talking about, he's already done it. He had already done it when he talked with Dr. Kallman, he had already given the details. Dr. Carlyle studied the same file and reached the exact opposite conclusion, that he was very likely in that relaxed atmosphere to try to find out something. He wanted to know what they could find out by his blood.

T. 2704-2705.

### c. Procedural Matters

The Mississippi Supreme Court decided this issue. *Carr I*, 655 So. 2d at 846. The

adjudication rendered unreasonable determinations of fact and is contrary to the controlling

authorities of the Supreme Court. § 2254(d).


**NO. 19:     THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT "DELIBERATE
DESIGN" COULD "EXIST IN THE MIND OF THE DEFENDANT BUT FOR AN INSTANT,"
VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

The trial court issued an improper instruction to the jury when it stated that "deliberate

design" could "exist in the mind of the defendant but for an instant" and as such would be

"sufficient deliberate design to constitute the offense of capital murder or murder."  Well

established federal law states that a defendant cannot form "deliberate design" at the very

moment of a fatal act because "deliberate design" requires some appreciable time for reflection

and consideration. The trial court's faulty jury instruction resulted in the jury improperly

convicting and sentencing Carr to death in violation of Carr's fundamental right to due process and a fair trial.

An improper jury instruction alone may rise to the level of constitutional error. *Cool v. United States*, 409 U.S. 100 (1972) (finding that jury instructions telling the jury to ignore defense testimony unless it believes it to be true beyond a reasonable doubt constituted reversable error). In order for the reviewing court to grant habeas relief for improper jury instructions, the trial court's instructions must have resulted in a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Williams v. Lockhart*, 736 F.2d 1264, 1267 (5th Cir. 1984).

A defendant cannot form "deliberate design" at the very moment of a fatal act. *Windham v. State*, 520 So.2d 123, 126 (Miss. 1987). Moreover, it is possible for the defendant to form deliberate design over time, and for the fatal act to constitute nothing greater than manslaughter. *Id.* A federal court affirmed this interpretation of "deliberate design":  that the accused must have had some appreciable time for reflection and consideration to form the requisite intent *before* committing the fatal act. *Craft v. King*, 2011 WL 2670732, at *11 (S.D. Miss. 2011) (citing *Windham v. State*, 520 So.2d 123 (Miss. 1987); *Blanks v. Slate*, 542 So.2d 222, 226–7 (Miss. 1989)). "Deliberate" always indicates full awareness of what one is doing and implies careful and unhurried consideration of the consequences and "design" means to calculate, plan, contemplate. *Craft*, 2011 WL 2670732, at *11 (quoting *Craft v. State*, 970 So.2d 178, 183–184 (Miss. Ct. App. 2007).

### b. Factual Allegations

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The state charged Carr with four counts of capital murder, and for each of those four counts, the court instructed the jury that it could convict Carr of capital murder if he "by his own act, or while acting in concert with another, did willfully, feloniously, without authority of law and of his *deliberate* design kill and murder [Carl, Gregory, Charlotte and Bobbie Jo]." Appellate R. 855, 857, 859, 861 (emphasis added). As for the element of "deliberate design," the Court issued the following instruction:

> The Court further instructs the jury that deliberate design as used elsewhere in these instructions, means intent to kill, without authority of law and not being legally justifiable or legally excusable.

> A deliberate design cannot be formed at the very moment of the fatal act, however, the deliberate design need not exist in the mind of the defendant for any definite time, not for hours, days, or even minutes, but if there is deliberate design, *and it exists in the mind of the defendant but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of capital murder or murder*.

Appellate R. 872 (emphasis added).

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 847, rendering a decision that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**NO. 20:**      **THE TRIAL COURT'S JURY INSTRUCTIONS VIOLATED CARR'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH, FIFTH, AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

The trial court forbade the jury from considering any lesser charge unless the jurors first unanimously agreed to acquit Carr from all counts of capital murder. These "acquittal-first" jury instructions enhanced Carr's risk of an unwarranted conviction of capital murder. The trial court's failure to give the jury the "third option" of convicting on a lesser offense inevitably enhances the risk of an unwarranted conviction. *Beck*, 447 U.S. at 637. If the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, a State is constitutionally prohibited from withdrawing that option from the jury in a capital case. *Beck*, 447 U.S. at 638. As in *Beck*, acquittal-first jury instructions requiring jurors to unanimously agree that the State had met its burden with respect to the death sentence, deprive the jury of a "third option." *Smith v. Spisak*, 558 U.S. 139, 160 (2010) (Stevens, J., concurring in part and concurring in judgment) (relying on *Beck*). Accordingly, acquittal-first jury instructions enhance the risk of an unwarranted conviction and violate Carr's constitutionally guaranteed due process right and right to a fair trial.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The trial court prohibited the jury from considering lesser charges unless the members unanimously agreed to acquit Carr of capital murder. The trial court instructed the jury as follows:

> If the state fails to prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence any one or more of these elements, then you shall find the defendant not guilty of capital murder under Count I, and you shall then proceed to consider the lesser included offense of murder of Charlotte Parker.

Appellate R. 855. This specification was included for each count of capital murder.

Further, the trial court told the jury that it must be "uninfluenced by (its) power to find a lesser offense" when considering the defendant's guilt of the crime of capital murder. Appellate R. 864.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 848, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

### NO. 21: THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON FINDING AN ESSENTIAL ELEMENT OF THE CRIME OF KIDNAPPING, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

Over trial counsel's objection, the court failed to instruct the jury that the crime of kidnapping requires the element of asportation, resulting in a failure to find that essential element of kidnapping and thus a conviction that violates Carr's Fourteenth, Fifth, and Sixth Amendment rights to due process and a fair trial. The court instructed the jury on the underlying felony of kidnapping as it applied to the murder of Gregory Parker. Defense counsel objected to this instruction on the grounds that it failed to include the necessary element of asportation. T. 2546. The defense proffered its own instruction which included the requirement of asportation as an element of the offense, but the court declined to adopt defendant's instruction S-3-A. T. 2556. Relying on the faulty instructions, the jury convicted Carr of felony kidnapping, without deciding the essential element of asportation. As such, the jury's kidnapping conviction violates Carr's right to due process and a fair trial.

The Fourteenth and Fifth Amendments "prohibit[] the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). The government bears the burden of proof and, in order to secure a conviction, a prosecutor must "convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson*, 443 U.S. at 316.

Here, the prosecution charged Carr of felony kidnapping, in violation of Miss. Code. Ann. § 97-3-53, as it applied to the murder of Gregory Parker. The felony kidnapping statute reads, in part:

> Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will, … shall on conviction suffer death or be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict, and the jury is authorized to so fix the punishment in its discretion].

Miss. Code. Ann. § 97-3-53 (1956). In interpreting this statute, the Mississippi Supreme Court has concluded that asportation, or the movement, of the victim in question is part of the inquiry. In *Aikerson v. State*, 274 So. 2d 124 (Miss. 1973), the Mississippi Supreme Court stated that "in order for one to be guilty of the crime of kidnapping, the victim must be removed from a place where he had the right to be, to another place." *Id.* at 128. Further, the Court concluded that interpreting the statute to not require the element asportation "would mean that any person who seized and held another in a fist fight or seized, hugged and kissed a woman without her consent, would be guilty of kidnapping." *Id*. at 127. The Court concluded that "the legislature did not intend to inflict the death penalty for such offenses." *Id*.

In *Cuevas v. State*, 338 So.2d 1236 (Miss. 1976), the Mississippi Supreme Court sought to clarify the meaning of Miss. Code. Ann. § 97-3-53. Although the Court did not require "the transportation of the victim," it nevertheless noted that "the present trend by most authorities is not the distance of asportation in kidnapping, but rather the fact of asportation as it relates to the

unlawful activity." *Id*. at 1238. Thus, absent a requirement that the jury find that Carr moved Gregory Parker against the victim's will, the underlying felony of kidnapping must fail.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Defense counsel objected to the trial court's proposed instruction of felony kidnapping because the instructions failed to include the necessary element of asportation. The defense proffered its own instruction which included the requirement of asportation as an element of the offense, but the trial court declined to adopt defendant's instruction S-3-A.

The State charged Carr with four counts of murder. Count III of the indictment charged Carr with the Murder of Gregory Parker while engaging in the crime of kidnapping in violation of Miss. Code. Ann. § 97-3-53. With respect to Count III of the indictment, the trial court instructed the jury as follow:

> If you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that on or about February 2, 1990, the defendant, ANTHONY CARR, … did **forcibly seize or confine** Gregory Parker… then ANTHONY CARR was engaged in the crime of kidnapping.

*Carr I*, 655 So.2d at 849 (emphasis added). Relying on the Mississippi Supreme Court's holding in *Aikerson*, 274 So.2d 124, trial counsel objected to trial court's instruction and proffered instructions, which included the element of asportation. Trial counsel argued that in order for one to be guilty of the crime of kidnapping, the victim must be removed from a place where he had a right to be, to another place. The trial court disagreed.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 848, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**NO. 22:** **THE TRIAL COURT ERRED IN PERMITTING PORTIONS OF THE TRIAL TO TAKE PLACE OUTSIDE THE PRESENCE OF MR. CARR, VIOLATING THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

Throughout the liability phase, the trial court erred by allowing portions of the trial to take place without Carr's presence, which violated Carr's right to a fair trial under the Sixth and Fourteenth Amendments. The Supreme Court has clearly established that "the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam). A critical stage of the trial is one that holds "significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 (2002).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

At least four bench conferences which excluded Carr. T. 1991, 2034, 2057, 2529 (e.g. discussion regarding examination of witnesses, including Martha Simon, a key witness for the State). Further, the in-chambers negotiation of the liability phase jury instructions was held without Carr's presence. T. 2677.

### c.  Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 850-51, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

### E.  SENTENCING PHASE

**NO. 23:  TRIAL COUNSEL COMPLETELY FAILED TO PREPARE MITIGATION EVIDENCE, VIOLATING THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

### a.  Statement of the Claim

Upon Carr's conviction on the four counts of capital murder, the evidence his counsel had at its disposal for presentation in his ensuing penalty phase concerned simply the evidence prepared for the liability phase showing his mental retardation. *See generally Penry v. Lynaugh*, 492 U.S. 302 (1989) (entitling petitioner to jury instruction requiring consideration of  evidence of mental retardation). Before Carr's guilty verdict, trial counsel had failed utterly to conduct any mitigation investigation and had neither retained a mitigation investigator nor spoken with Carr's family. Doc. #10-13 at 2. The sentencing phase of Carr's trouble immediately followed the entry of his guilty verdict, affording no time for counsel even to attempt to recover from the complete lack of preparation. Counsel failed to prepare any mitigation evidence, resigning Carr's team to putting on the stand in the penalty proceedings only his elementary school principal (Larry Jackson), a high school guidance counselor (Varner Rencher), and, the clinical psychologist who had earlier opined on Carr's intellectual disability (Dr. Kallman). T. 2822, 2832, 2845.

A total lack of preparation of a case in mitigation is seldom seen in capital trials, yet that is the record at bar. As set forth herein (*supra*, Section III, at 11 et seq.), *Strickland v.*

*Washington*, 466 U.S. 668 (1984), governs trial counsel's performance generally. *See also (Terry) Williams v. Taylor*, 529 U.S. 362 (2000) (failure to investigate and present substantial mitigating evidence during sentencing phase violates right to effective assistance of counsel).

### b. Factual Grounds

Trial counsel conducted no mitigation preparation. Doc. #10-13 at 2. Even without any mitigation preparation at all, however, counsel was aware of numerous witnesses able to testify to Carr's life circumstances and the multi-generational history of his family by virtue of initial steps taken in identification of information sources relating to his intellectual disability. Specifically, the identity of Carr's cousins and siblings was known to counsel but no steps were taken to elicit information from these people, let alone to develop evidence about Carr from them for presentation at trial.

Post-conviction counsel also failed to develop mitigation evidence for its motion seeking leave for trial court proceedings, which the Mississippi Supreme Court denied. *Carr II*, 873 So.2d at 104. Counsel obtained a one-page sworn affidavit from Carr's sister, Jackie, but failed to include it with the application for leave. Doc. #11-3. Jackie Carr averred that she had tried multiple times, unsuccessfully, to contact trial counsel, but never spoke with her brother's trial attorney's office. *Id.* She stated that her family only learned of case developments from the news and Carr's counsel did not contact family members about testifying for Anthony. Jackie Carr stated that her mother, Mamie Carr, and she were willing and able to testify for Anthony at trial and wanted to relate to his jury details showing he was a kind and loving brother. *Id.*

In addition, Carr's other immediate family members, such as sister Mary Brooks, were available and willing to testify for him. Carr's various cousins and second cousins and family friends from his childhood and early adulthood possessed first-hand information about his life

history and circumstances that would supply ample bases for a lesser punishment than death. At and around the time of trial, these prospective witnesses included, to provide a illustrative list, Melzina Carr, Terry Carr, Gladys Marbley, Wilbert Grayson, Gloria Carr Ratliff, and Linda Morgan. These witnesses were able to present evidence of both Carr's good character as a family member and neighbor and his dire life circumstances stemming from his abject poverty and lack of meaningful social supports.

As reflected in initial investigative steps carried out by post-conviction counsel, Carr's physical environment exposed him to agriculture-based toxins prenatally and throughout his life. Doc. #10-26 at 2. Carr's family recalls considerable violence visited upon his mother at the hands of his father. *Id.* Carr's family endured grinding poverty, including at different times the absence of running water and electricity, the loss of utilities and home furnishings, and abject chronic hunger and malnutrition. *Id.* Carr's family further reports his mother was chronically physically abusive to Anthony. *Id.* Carr suffered multiple head injuries including from a speeding motorcycle crash into a brick wall. *Id.* at 3. Initial investigations reflected strong indications of a history of serious depression and associated mental illness. *Id.*

### c. Procedural Matters

Post-conviction counsel raised the issue by further evidencing trial counsel's utter lack of preparation—an absence of preparation plainly evident from the penalty phase record itself. The state court proceedings were plainly materially incomplete and Carr obtained neither the means nor the judicial process to present his claim reflecting the deficiency of his counsel's performance and the prejudice from that performance resulting from the total absence of a potential welter of information showing Carr's life circumstances and individual humanity to his

jury. Thus, there has been no merits adjudication of Carr's stunted claim of penalty phase trial counsel ineffectiveness. *Supra*, *section* II.C ("Application of AEDPA").

**NO. 16:    THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO ELICIT HEARSAY EVIDENCE IN VIOLATION OF MR. CARR'S CONFRONTATION CLAUSE AND DUE PROCESS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a.  Statement of the Claim

During the sentencing phase, the trial court again considered whether to admit statements by Robert Simon indicating his culpability, this time through the testimony of Quitman County Sheriff Jack Harrison. The trial court first denied entry, but after hearing Harrison's testimony in chambers, allowed admittance on the condition that Simon's statements both inculpating and exculpating Carr be allowed in. While the admittance of Simon's statements exculpating Carr were permissible under principles of due process, his statements inculpating Carr were not. As such, admitting this testimony was a violation of Carr's rights emanating from the Confrontation Clause and Due Process Clause.

"The right of an accused in a criminal trial is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The introduction of an oral confession implicating both the confessor and co-defendant through the testimony of a government agent violates the co-defendant's right of confrontation. *Bruton v. United States*, 391 U.S. 123, 127-128 (1968) (where the confession "added substantial, perhaps even critical, weight to the

Government's case in a form not subject to cross-examination, since [confessor] did not take the stand").

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

During the penalty phase, the trial court first denied admittance of Simon's statements through Harrison's testimony on the same grounds relied upon in the liability phase. T. 2779. However, after hearing Harrison's testimony in chambers, the trial court allowed the admittance of what essentially became the entirety of Simon's statement to law enforcement.

In chambers, trial counsel made an offer of proof to admit Harrison's testimony. T 2871. Harrison was brought into chambers and confirmed that he testified at the trial of Robert Simon that Simon admitted to killing the Parker family. T. 2875-76. The State provided Harrison with a copy of the law enforcement report on Simon's statement, Exhibit 112, and Harrison recounted that Simon admitted to killing the Parker family with a firearm he stole from a woman in Winona. T. 2877. Harrison further testified that Simon stated Anthony Carr and Willie Lee Henderson committed the offense. T. 2879-2880. The trial court found that *Green v. Georgia* was controlling and ruled that Harrison's testimony regarding both Simon's statement admitting to the offense *and* his statement implicating Carr would be admissible. T. 2884. Trial counsel objected to the admittance of testimony implicating Carr as a violation of the confrontation clause. T. 2885-2886. The trial court justified the admittance of both statements, stating "the Court doesn't consider it waiving the confrontation clause, the Court considers it as being conflicting statements made by the same

person, and the jury could not judge the statement that he said he killed them without also judging that he also said that Carr, and he believed Henderson, was with him." T. 2886.

In court, Harrison was questioned on direct examination by the defense and stated "[Simon] said he was involved with the killing." T. 2905. When cross-examined by the State, counsel asked about additional statements that Simon made, and trial counsel objected under the confrontation clause and the Eighth Amendment. T. 2907. The objection was overruled, and trial court instructed the State, "Mr. Mellen, I'm not telling Counsel how to question, but you're on cross-examination and you can ask [Harrison] in the context talking about Carr or something like that." *Id.* When the State elicited this testimony, trial counsel again objected on the same grounds and was again overruled by the court. T. 2908. Harrison then testified that "[Simon] said that Anthony Carr killed the Parkers along with another." *Id.* On redirect examination, trial counsel referenced State's Exhibit 112, previously reviewed in chambers, but Harrison claimed he had never seen the statement before. T. 2908-2909. After several bench conferences, trial court instructed the jury that both parties stipulated the aforementioned exhibit had been discussed in chambers. T. 2910. Trial counsel then confirmed that Harrison testified at Simon's trial that Simon stated he killed the Parker family. *Id.*

Following Harrison's testimony, the defense moved for a mistrial in the penalty phase and a directed verdict for life imprisonment on the grounds that Harrison's testimony was "highly prejudicial and inflammatory" in that it was "totally contrary to that statement in that he brought out that Anthony Carr allegedly admitted killing the Parkers…and totally contrary to the Court's order and defense counsel's understanding of what Sheriff Harrison's testimony would be once he was placed before the jury." T. 2913. Trial counsel argued that

"the impact of that testimony [could not] be erased from the minds of the jurors at this point and it's false, extremely misleading and prejudicial" to the defendant. T. 2913-2914. The trial court overruled the motion, finding no conflict and stating "[t]he Court reads from the statement that was permitted to be used and the Court draws the same conclusion that Simon said Carr and Henderson and he would guess that Henderson was with him or something to that effect. The Court believes that in context that Simon did make that statement". T. 2915.

### c.  Procedural Matters

The state court adjudicated this issue, *Carr I*, 655 So.2d at 833-36, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).


### NO. 25:  THE TRIAL COURT ERRED IN EXCLUDING EXCULPATORY STATEMENTS FAVORABLE TO MR. CARR IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

### a.  Statement of the Claim

While the trial court admitted a portion of Simon's out-of-court statement (*supra*, No. 24), the court also excluded a significant part of that statement, in which Simon confessed that the weapon used in the murder of the Parker family was not only his, but that he had obtained it in a prior robbery. The Constitution prohibits a sentencing proceeding from yielding arbitrary results. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). In applying capital punishment, the Eighth Amendment demands a certain "standard of reliability." *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985). In furtherance of this objective, courts should allow nearly "any aspect of a defendant's character or record" to be proffered as a mitigating factor in a capital case. *Lockett v.*

*Ohio*, 438 U.S. 586, 604 (1978). Under *Green*, the exclusion of testimony favorable to the accused constitutes a violation of due process. 442 U.S., at 97.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

As explained above, during Sheriff Harrison's testimony in chambers he recounted that Simon admitted to killing the Parker family with a firearm he stole from a woman in Winona. T. 2877. When trial counsel objected to the admittance by any statement adverse to Mr. Carr made by Simon, he specified he wanted to introduce the parts of Simon's statement that "he killed the Parkers, that the guns were his,…and that Willie Henderson was involved." T. 2886-87. However, upon the State's objection that the prosecution should not be so limited in what they might introduce from the statement, the trial court ruled that "[y]ou can say that he also said at that point that he wouldn't say who was involved with him. You won't get into the guns…" T. 2887.

### c. Procedural Matters

The state court adjudicated this issue, *Carr I*, 655 So.2d at 836, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**No. 26:** **THE TRIAL COURT ERRED IN EXCLUDING EXPERT TESTIMONY IN THE PENALTY PHASE THAT MR. CARR PASSED A POLYGRAPH EXAMINATION, VIOLATING HIS RIGHT TO PRESENT MITIGATING EVIDENCE AND DUE PROCESS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

During the sentencing phase, the State objected to trial counsel introducing testimony from George Patterson, a polygraph examiner, regarding the examination he administered to Carr subsequent to his arrest. The trial court denied the admission of the testimony on the grounds that polygraph results were inadmissible under state law despite the well-established Federal constitutional authorities supervening such state hearsay rules in capital cases. This denial was in error and violated Carr's right to present mitigating evidence during his sentencing proceeding.

In *Lockett v. Ohio*, the Supreme Court held that the Eighth and Fourteenth Amendments demand that the sentencing authority "in all but the rarest capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604 (1978). Despite a blanket prohibition under state law, exclusion of relevant and reliable testimony constitutes a violation of Due Process. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam) (holding unconstitutional the blanket exclusion of evidence based on state hearsay law). In other words, a "mechanistic[]" application of a rule "'may not be applied…to defeat the ends of justice,'" by summarily denying the submission of a particular category of evidence in mitigation. *Id.* (quoting *Chambers*, 410 U.S. at 302).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

During sentencing, the State objected to the introduction of Patterson's testimony regarding Carr's polygraph examination, stating that the "law forbids in evidence the result of a lie detector test." T. 2769-71. The State further noted its possession of the results of a second

polygraph examination that suggested Carr was lying about the disposal of coveralls related to the crime, but that ultimately preferred testimony regarding both examinations be denied admission. T. 2771. Trial counsel objected to the introduction of the second examination results but maintained his assertion that testimony on the first polygraph be admitted. T. 2772. Trial counsel argued that the burden for introducing evidence in mitigation is less than that in the liability phase of a trial, and that under the Sixth, Eighth, and Fourteenth Amendments, a sentencing body must not be denied "considering as a mitigating factor any aspect to the defendant's character in any of the circumstances of the events that the defendant proffers as a basis for a sentence less than death." T. 2772-73. In response, the State argued that admitting testimony regarding the results of the first polygraph would equate to asking the jury to reconsider Carr's guilt. T. 2774. The Court then denied the defendant's position of admitting one polygraph while denying the other. T. 2774. Later, trial counsel proposed that testimony regarding both polygraphs be admitted, which the State again objected to on the basis that all polygraph evidence is inadmissible. T. 2780. The Court concurred with the State, concluding that polygraphs are "totally unreliable" and, further, to admit both would confuse the jury. T. 2780.

### c. Procedural Matters

The state court adjudicated this issue, *Carr I*, 655 So.2d at 836, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).


**NO. 27:** **THE TRIAL COURT'S FAILED TO INSTRUCT THE JURORS THEY COULD SENTENCE MR. CARR TO LIFE EVEN IF AGGRAVATING FACTORS OUTWEIGHED MITIGATING ONES, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

At the sentencing phase of the trial, defense counsel requested the following instruction:

> Even if you find one, or more aggravating circumstances, and you find that the aggravating circumstance, or circumstances, outweigh the mitigating circumstances, you may still conclude that the circumstances are insufficient to warrant the death penalty, and you may recommend mercy and sentence the defendant to life imprisonment.
>
> You are not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court.

T. 883. The trial court refused the instruction. *Id.*

The trial court's refusal to provide this instruction violated Carr's right under the Eighth and Fourteenth Amendments to have the jury consider any mitigating evidence that the defendant proffers as a basis for a sentence less than death. The jury was not adequately instructed that it had the power to grant mercy regardless of the outcome of the weighing process. The fact that some juries receive this mercy instruction and others do not injects an intolerable element of capriciousness in capital sentencing.

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original); *accord Penry v. Lynaugh*, 492 U.S. 302, 317 (1989). "[A] sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Penry*, 492 U.S. at 318 (citing *Eddings v. Oklahoma*, 455 U.S. 104 (1982)); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 304 (1990) ("A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." (quoting *Jurek v. Texas*, 428 U.S. 262, 271 (1976)); *California v. Brown*, 479 U.S. 538, 541 (1987)

("Consideration of [mitigation] evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).  "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319.

"The appropriateness of the exercise of mercy can itself be a mitigating factor" that the jury "may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted." *See Kansas v. Marsh*, 548 U.S. 163, 176 & n.3 (2006) (approving Kansas mercy instruction).  Such a "'mercy' jury instruction . . . forecloses the possibility of *Furman*-type error as it 'eliminate[s] the risk that a death sentence will be imposed in spite of facts calling for a lesser penalty.'" *Id.* at 176 n.3.

Under Mississippi's statutory scheme, jurors during the penalty phase of a capital case are instructed to weigh mitigating and aggravating circumstances in order to determine whether to render a verdict of life imprisonment or impose a sentence of death. Miss. Code. § 99-19-101. The statute dictates that a sentence of death requires that the jury unanimously find that the aggravating circumstances outweigh the mitigating circumstances. *Id*. § 99-19-101(3)(c). The statute is silent as to whether the jury must unanimously find that the mitigating circumstances outweigh the aggravating circumstances in order to render a sentence of life. Thus, the statutory scheme permits jurors to grant a life sentence even if the aggravating circumstances outweigh the mitigating circumstances. *Id.* Nevertheless, reasonable jurors, upon receiving the judge's instructions in the case, may well have concluded that they would have to find that mitigating circumstances outweighed aggravating circumstances in order to grant the defendant a life sentence. Without the proffered instruction, there is a substantial probability that the jury

rendered its verdict under the erroneous assumption that it could not grant a life sentence unless there were numerically more mitigating circumstances than aggravating. This is constitutionally intolerable. *Mills v. Maryland*, 486 U.S. 367, 384 (1988).

The failure to provide this instruction precluded the jury from considering mitigating evidence that Carr offered in support a verdict of life. *See Marsh*, 548 U.S. at 176 & n.3. Because Carr was precluded from offering evidence in support of a life sentence, he was deprived of his constitutional right to offer "any relevant mitigating evidence." *Mills*, 486 U.S. at 374–75 ("[T]he sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986))). "[I]t is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling." *Id.* at 375 (citations omitted). "Unless [the court] can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, [the court] must remand for resentencing." *Id.* at 377.

Moreover, the 'mercy instruction' proffered in this case is approved by the Mississippi Supreme Court and frequently given in capital cases. When such an instruction is provided in some cases and not in others, there is "'a substantial risk that the [death penalty will] be inflicted in an arbitrary and capricious manner.'" *Lockett*, 438 U.S. at 601 (quoting *Gregg*, 428 U.S. at 188). "[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring).

Further, while Carr was not permitted to present this mitigating evidence to the jury, other capital juries have sought and received such an instruction during the penalty phase. *See, e.g.*, *Turner v. State*, 573 So. 2d 657, 668 (Miss. 1990); *Tokman v. State*, 435 So. 2d 664, 671

(Miss. 1983); *Evans v. State*, 422 So. 2d 737, 746 (Miss. 1982); *Wiley v. State*, 484 So. 2d 339, 349 (Miss. 1986). The trial court offered no rationale for refusing the instruction. The court's refusal to give the instruction that Carr proffered injected an intolerable risk that Carr's sentence was imposed in an arbitrary and capricious manner. *Gregg*, 428 U.S. at 188; *Furman*, 408 U.S. at 310. This error requires reversal of Carr death sentence and remand for resentencing.

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 849-50, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

### NO. 28: THE TRIAL COURT ERRED IN ITS LIMITING INSTRUCTION OF THE AGGRAVATING CIRCUMSTANCE THAT THE OFFENSE WAS "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL," VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

At sentencing, the trial court instructed the jury on aggravating factors it must find – weighed against mitigating circumstances – to impose the death penalty. For each of the four causes, the State proffered the aggravating factor that the crime committed was "especially heinous, atrocious, or cruel" over the objection of the defense. On its face, the "especially heinous" aggravating factor is unconstitutionally vague, vagueness that must be cured by a limiting instruction, which the court gave in this case. However, the limiting instruction given

was no more precise or guiding than the "especially heinous" factor itself. As a result, the sentenced passed on Carr is violative of his rights against cruel and unusual punishment and due process of law.

The Eighth and Fourteenth Amendments prohibit the application of capital punishment in a manner that is "arbitrary and capricious," requiring a sentencing authority's discretion be "suitably directed and limited." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *Furman*, 408 U.S. 238. A sentence may be rendered arbitrary and capricious by the application of a vague and imprecise aggravating factor. *Godfrey v. Georgia*, 446 U.S. 420 (1980). Absent a sufficient limiting instruction, the aggravating factor "especially heinous, atrocious, or cruel" is unconstitutionally vague and insufficient to sustain a death penalty. *Maynard v. Cartwright*, 486 U.S. 356, 359, 363-64 (1988). In determining whether a limiting instruction is sufficient, federal courts must first "determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654 (1990) (overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002)). If so, the court must then "attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer." *Id.*

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Over the defense's objection at the conclusion of the sentencing phase, the jury was given a limiting instruction to the "especially heinous, atrocious and cruel" aggravating factor. In Mississippi, the finding that a crime was "especially heinous, atrocious, or cruel" is a statutory

aggravating factor used to guide the sentencer in determining punishment in capital cases. Miss.
Code. Ann. § 99-19-101(5)(i).

Prior to sentencing, counsel and the trial judge met in chambers to discuss the sentencing
instructions. Defense counsel objected to the "heinous, atrocious, and cruel" aggravating factor
on the grounds that prior testimony indicated the offenses were not "set apart from the norm
murders with firearms." T. 2945. The judge replied, "that's for the jury to decide. Most every
murder might be found under that category, also." *Id.* The judge then noted the factual
circumstances of the case that distinguished it from, for example, "the shooting of a cashier at a
convenience store…it's simply not in that category." T. 2946.

> At sentencing, the Court instructed the jury the following limiting instruction to the
> "especially heinous, atrocious or cruel" aggravating factor:
> The Court instructs the jury that in considering whether the capital offense was especially
> heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil;
> atrocious means outrageously wicked and vile; and cruel means designed to inflict a high
> degree of pain with indifference to, or enjoyment of the suffering of others.
>
> In order for you to find in this case the aggravating circumstance that the crime was
> especially heinous, atrocious, or cruel, you must unanimously find beyond a reasonable
> doubt that the capital offense was accompanied by such additional acts as to set the crime
> apart from the norm of capital offenses – that is, that the crime was conscienceless,
> pitiless, or unnecessarily torturous to the victim.

Appellate R. 881. The Court then preceded with instructions for each of the four causes, only
proffering the bare "especially heinous, atrocious or cruel" statutory aggravating factor for each
cause *Id.* 890, 894, 898, 902. The jury found this aggravating factor to exist in all four causes. T.
2988, 2990, 2992, 2994.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 851, rendering a decision
based on unreasonable determinations of fact and that is contrary to and an unreasonable
application of the constitutional authorities. § 2254(d).

**No. 29: The Trial Court Erred in Allowing the Jury to Consider the "Pecuniary Gain" Aggravating Circumstance, Violating the Eighth and Fourteenth Amendments.**

### a. Statement of the Claim

At the close of the sentencing phase, the trial court instructed the jury to consider on all four counts of capital murder the aggravating factor that the crime was committed for "pecuniary gain." Facially, the pecuniary gain aggravating circumstance is unconstitutionally vague. Additionally, the factor was applied concurrently with robbery as an aggravating factor in the count regarding the death of Carl Parker. This foremost vague, and essential duplication of aggravating circumstances resulted in a sentence that was arbitrary and in violation of Carr's Eighth and Fourteenth Amendment rights.

The Eighth and Fourteenth Amendments prohibit the application of capital punishment in a manner that is "arbitrary and capricious," requiring a sentencing authority's discretion be "suitably directed and limited." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *Furman*, 408 U.S. 238. A sentence may be rendered arbitrary and capricious by the application of a vague and imprecise aggravating factor. *Godfrey v. Georgia*, 446 U.S. 420 (1980). In determining whether a limiting instruction is sufficient, federal courts must first "determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654 (1990) (overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002)). If so, the court must then "attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer." *Id.*

### b.  Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

At sentencing, the trial court instructed the jury to consider the aggravating factor as to whether the offense was committed in the interest of pecuniary gain. In Mississippi, pecuniary gain is a statutory aggravating factor used to guide the sentencer in determining punishment in capital cases. Miss. Code. Ann. § 99-19-101(5)(f) (West 1989). Prior to sentencing, trial counsel objected to inclusion of the underlying offenses as aggravating circumstances as it constituted a violation of the Eighth and Fourteenth Amendments. T. 2943-2944. At sentencing, the trial court instructed the jury with the pecuniary gain aggravating factor on all four causes. Appellate R. 890, 894, 898, 902. And the jury subsequently found that factor to exist in all four causes. T. 2988, 2990, 2992, 2994. In addition, with respect to count two, the jury found the aggravating circumstance that the offense was committed while the defendant was engaged or was an accomplice in the commission of a robbery. T. 2989-2990.

### c.  Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 852, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**No. 30:  THE STATE MADE INAPPROPRIATE AND PREJUDICIAL STATEMENTS REGARDING BIBLICAL LAW, VIOLATING MR. CARR'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

During the sentencing phase, the State's closing arguments invoked biblical law as the basis for why Carr should be sentenced to death, resulting in a sentence that violates Carr's Fifth, Sixth and Fourteenth Amendment rights to a fair trial and due process. Throughout his closing, District Attorney Mellen inseparably tied quotations from the Bible to the imposition of capital punishment on Carr. Through these references, the prosecutor attempted to impose a biblical sense of responsibility upon the jury to sentence Carr to death. These statements were both improper and prejudicial to Carr, and as such, the sentence imposed by the jury in this case violates Carr's right to a fair trial and due process of law.

A prosecutor's comments may render a trial unfair when the comments "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *accord Parker v. Matthews*, 567 U.S. 37 (2012) (recognizing the *Darden* holding as clearly established Federal law). In *Darden*, the Supreme Court articulated the general factors considered in determining whether a due process denial occurred: Manipulation or misstatement of evidence, implication of a specific right of the accused, curative trial court instructions that closing arguments were not in evidence, weight of the evidence against the accused, and whether the defense had an opportunity to make a final rebuttal. *Id.*, at 181-182. While *Darden* presents a "highly generalized standard for evaluating claims of prosecutorial misconduct," it "[leaves] courts 'more leeway … in reaching outcomes in case-by-case determinations.'" *Parker*, 567 U.S. at 48-49 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Though *Darden* did not specifically address whether the injection of biblical law into the prosecution's closing would rise to a violation of due process, in *Romine v. Head*, the Eleventh Circuit found the state

court's rejection of a biblical law closing argument claim strictly on the basis of state court precedent as having not applied federal law at all, rendering the federal habeas court "'…unconstrained by §2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause.'" 253 F.3d 1349, 1355 (11th Cir. 2001) (Quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

Throughout the course of the State's penalty phase closing statements, the prosecutor expressly urged the jury to apply his understanding of Biblical commands.

Early in the prosecution's closing, District Attorney Mellen made the following statement:

> Now, what is this law that protects Charlotte and Gregory and Carl and Bobbie Jo, where does it come from? Well, quite basically, it comes from the existence in the beginning of time of man. Biblically, in Genesis 9:6, there's a reason for it, 'Whoever sheds man's blood, by man shall his blood be shed.' And what that means is that we are given the responsibility, that we as people are given the responsibility where someone is killed, then we have responsibility to shed man's blood, to exact punishment, and there's a reason that we're given that responsibility in the next verse. In verse 7 it says, 'Because in God's image he made man.' Man's important and that's why we have that law, man is important.

T. 2962. The State continued that "the defense yells 'compassion,' but where was compassion on the 2nd of February? Justice, justice in this court demands death in this Court, it demands it. The law demands it and we ask for it." T. 2963. After the Defense responded to these statements in closing with reference to the New Testament, the State retorted,

> The defense attorney stood up here and has said that it's not for us to exact vengeance and has accused us of exacting and attempting to exact vengeance, we don't intend to do that. It's not for us, it has never been for us. 'Vengeance is mine sayeth the Lord.' That's his, he imposes vengeance.

T. 2977. Finally, the State completed its argument with the following statement:

> [A]nd the defense says forget about that, 'We can't do anything about that now, let's forget about it.' Let's turn their cheeks? Let's turn their cheeks? We can't turn their cheeks. 'Do not deceive, God is not mocked, for whatsoever a man seweth that also shall he reap.' Anthony Carr had a ball, and all we seek now, and this is it, we have no other opportunity, to seek justice.

T. 2978.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 853-54, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

## NO. 31: TRIAL COURT'S FAILURE TO GIVE PEREMPTORY INSTRUCTIONS TO THE JURY ON UNDISPUTED MITIGATING CIRCUMSTANCES VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

### a. Statement of the Claim

Trial counsel requested peremptory instructions in the sentencing phase regarding undisputed mitigating circumstances—such as Carr's lack of significant criminal history and his extreme mental and emotional disturbance—yet the trial court rejected these requests. T. 2957-58. The plain text of the capital sentencing statute called for certain mitigating circumstances to be recognized: "Mitigating circumstances shall be the following . . ." Miss. Code Ann. § 99-19-101(6) (West 1989)—and the state supreme court has expressly recognized that "[t]he Eighth and Fourteenth Amendments to the Constitution require that the jury not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death" *Ladner v. State*, 584 So.2d 743, 762 (Miss. 1991) (citing *Lockett*, 438 U.S. 586).

The capital sentencing process must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment, which thereby contemplates the defendant's "legitimate interest in the character of the procedure which leads to the imposition of sentence." *Gardner v. Florida*, 430 U.S. 349, 357, 358 (1977). The statutory requirement, as a predicate to a death verdict, that the jury consider the mitigating circumstances enumerated in the statute, Miss. Code Ann. § 99-19-101(2)(c) (West 1989), makes the absence of articulated, undisputed, mitigating factors in the jury's sentencing instructions in Mr. Carr's case a violation of "liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."[28] *Vitek v. Jones*, 445 U.S. 480, 488 (1980).  Thus, the trial court's failure to include peremptory instructions on undisputed mitigating circumstances rendered a death sentence in violation of the Fourteenth Amendment's protections against the arbitrary deprivation of life and liberty. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("The defendant . . . has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.").

---

[28] The impropriety of Carr's sentence resulting from this violation of his liberty interests is plainly of Federal constitutional moment, and "not merely a matter of state law. A criminal defendant has a substantial and legitimate expectations that such circumstances will not be employed in sentencing him to death. The state-created protection cannot be arbitrarily abrogated, as it was here, without violating the Constitution." *Barclay v. Florida*, 463 U.S. 939, 986 (1983) (Brennan, J., dissenting).

A key requirement for the death penalty to withstand Eighth Amendment scrutiny rests on the jury's ability to weigh aggravating and mitigating circumstances so as to avoid the arbitrary and capricious application of the harshest sentence. *Gregg v. Georgia*, 428 U.S. 153, 194-95 (1976) (holding that capital punishment is constitutional when the jury is instructed on statutory factors of aggravation and mitigation); *see also Jackson v. State*, 337 So.2d 1242, 1255 (Miss. 1976) (holding that aggravating and mitigating circumstances must be weighed against each other to ensure that death penalty will not be "wantonly or freakishly imposed").

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The issue of whether or not the trial court's sentencing instructions should have included peremptory instructions regarding statutorily defined mitigating circumstances was raised by defense counsel during the trial. Despite this, the trial judge refused all five proposed mitigating factors yet only explained his reasons for refusing one of the five. Failure to include preemptory instructions on mitigating circumstances violated Carr's constitutionally protected due process rights, his right to a jury trial, and his right to be free of cruel and unusual punishment.

Before closing arguments in the penalty phase, trial counsel proposed peremptory instructions regarding the mitigating circumstances:

> The Court instructs you that you must find the following mitigating circumstances in this case: "Anthony Carr has no significant history of criminal activity."

Appellate R. 884.

> The Court instructs you that you must find . . . "The capital offenses were committed while Anthony Carr was under the influence of extreme mental or emotional disturbance."

Appellate R. 885.

> The Court instructs you that you must find . . . "The capacity of Anthony Carr to appreciate the criminality of his conduct was substantially impaired."

Appellate R. 886.

> The Court instructs you that you must find . . . "Anthony Carr was an accomplice in the capital offense committed by another person and his participation was relatively minor."

Appellate R. 887.

> The Court instructs you that you must find . . . "Anthony Carr acted under extreme duress or under substantial domination of another person."

Appellate R. 888. The court only offered a reason for refusing the first proposed peremptory instruction, that Carr had no significant history of criminal activity, stating that he felt that it was an issue "for the jury to determine." T. 2957. The remaining proffered peremptory mitigating circumstances were rejected with no discussion as to Judge Smith's reasoning. He simply stated, "[t]hey'll be refused. I believe that concludes the instructions.". T. 2958. In the end, the trial court failed to instruct the jury sufficiently to enable it to enter a constitutional sentence under Mississippi's statute.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 856, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**NO. 32: TRIAL COURT'S FAILURE TO INSTRUCT THE JURY TO MAKE WRITTEN FINDINGS OF THE SPECIFIC AGGRAVATING CIRCUMSTANCES UNANIMOUSLY FOUND BEYOND A REASONABLE DOUBT VIOLATED THE SIXTH AND FOURTEENTH AMENDMENTS.**

### a. Statement of the Claim

The trial court's sentencing instructions failed to explain to the jury that any specific aggravating circumstances, which must be unanimously found beyond a reasonable doubt in order to impose a death sentence, must be made in writing. Appellate R. 889-905. The plain text of the capital sentencing statute called for this— "In order to return and impose a sentence of death the jury must make a written finding of one or more of the following . . ." Miss. Code Ann. § 99-19-101(7) (West 1989)—and the state supreme court expressly held that such written findings were "indispensable," construing the statute to demand this "even where the defendant pled guilty in the first phase" of his bifurcated capital trial. "a separate, explicit and written jury finding" regarding a defendant's actions and intent "is indispensable to the valid imposition of the death penalty," *Pinkton v. State*, 481 So.2d 306, 307, 310 (Miss. 1985) (holding that "a separate, explicit and written jury finding" regarding a defendant's actions and intent "is indispensable to the valid imposition of the death penalty.").[29] The jury's verdict manifests confusion as to the requirement that the aggravating circumstances must be specific to Carr's case; the verdict form for all counts list every aggravating factor included in the jury instructions, including the "is/are" language, suggesting that the statutory language was simply copied from the form rather than that the jury actually made the requisite specific finding. T. 2987-94.

The capital sentencing process must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment, which thereby contemplates the defendant's "legitimate interest in the character of the procedure which leads to the imposition of sentence." *Gardner v. Florida*, 430 U.S. 349, 357, 358 (1977). The statutory requirement, as a predicate to a death verdict, of an

---

[29] *Pinkton* construed the 1984 version of the code, which was unchanged in relevant part in the 1989 version applicable at Carr's trial.

express jury finding of any aggravating circumstance, Miss. Code Ann. § 99-19-101(3) (West 1989), makes the absence of such specific written findings in Carr's case a violation of "liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."[30] *Vitek v. Jones*, 445 U.S. 480, 488 (1980). Thus, the trial court's failure to instruct the jury to make the statutorily requisite specific findings as to the statutory aggravating circumstances rendered a death sentence in violation of the Fourteenth Amendment's protections against the arbitrary deprivation of life and liberty. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("The defendant . . . has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.").

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

The issue of whether or not the trial court's sentencing instructions required the jury to specify, in writing, which aggravating circumstances they relied upon was raised by defense counsel during the trial. Indeed, the court expressed confusion as to the level of specificity that was required by the controlling statute. This confusion, and failure to make a clear ruling on the

---

[30] The impropriety of Carr's sentence resulting from this violation of his liberty interests is plainly of Federal constitutional moment, and "not merely a matter of state law. A criminal defendant has a substantial and legitimate expectations that such circumstances will not be employed in sentencing him to death. The state-created protection cannot be arbitrarily abrogated, as it was here, without violating the Constitution." *Barclay v. Florida*, 463 U.S. 939, 986 (1983) (Brennan, J., dissenting).

issue, resulted in vague jury instructions and a similarly vague verdict that violated Carr's constitutionally protected Due Process rights and the right to a jury trial.

Before closing arguments in the penalty phase, trial counsel raised whether the statute required the jury to write the underlying facts upon which they based their findings or if it was sufficient for the jury to simply state which aggravating circumstances they were relying on. T. 2936-37. The court, without looking at the language, suggested that the statute only required the jury to "set[] out the aggravating circumstances that they find . . ." yet admitted that, concerning the proceeding's adherence to the death penalty sentencing statute, his honor was "shooting from the hip" based on his "recollection." T. 2937. Further, when the court finally did consult the statute, Judge Smith consulted § 99-19-105—which covers *appellate* review, not the jury's determination of the death penalty. *Id.*; *see also* Miss. Code Ann. § 99-19-105 (1989).

The confusion of the trial court is evident from the record, as the court stated unequivocally that he was "not sure [the jury verdict form is] reviewed by the Supreme Court . . ." T. 2937. The prosecution realized the error and tried to correct it by drawing the court's attention to the correct statute, but the court had already shifted gears to a discussion about mitigating circumstances. *Id.* In the end, the trial court failed to instruct the jury sufficiently to enable it to enter a constitutional sentence under Mississippi's statute.

From the trial record, it is impossible to know which of the aggravating factors the jury found beyond a reasonable doubt. The trial record indicates that the jury was, in fact, confused as to what was required of them with regards to the aggravating circumstances. For each count, the jury verdict form that was read into the record listed all five aggravating factors included in the jury instructions, followed by "is/or sufficient to impose the death penalty . . . ." T. 2988, 2990, 2992, 2994.

The transcript reflects no meaningful basis for understanding that the jury in fact made any discrete findings as to the aggravating circumstances. Quotation of one of the four, repetitive instances of this portion of the proceedings illuminates this point:

> We, the jury, unanimously find that the aggravating circumstances of B(1), whether the capital offense was committed by a person under sentence of imprisonment. (2), whether the capital offense was committed while the defendant was engaged or was an accomplice in the commission of the crime of sexual battery. (3), the capital offense was committed for the purpose of avoiding or preventing the lawful arrest. (4), the capital offense was committed for pecuniary gain. (5), the capital offense was especially heinous, atrocious or cruel is/or sufficient to impose the death penalty . . .

T. 2987-88. The meaninglessness of these ostensible findings with respect to the statutory aggravators is captured in the fact that in each recitation of the statutory language referenced above, the jury expressly invokes the B(1) circumstances entertaining that "the capital offense was committed by a person under sentence of imprisonment," despite the fact that no evidence was presented during the trial that Carr was incarcerated at the time of the murders. *See, e.g.*, T. 2987.

The "is/or" language noted above parroted the language that was included in the jury instructions, Appellate R. 892, 896, 900, 903, calling into serious question whether or not the jury understood they only needed to write out the aggravating factors they unanimously agreed upon rather than all of the aggravating circumstances included in the jury instructions.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 856, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

**No. 33:** **The Mississippi Supreme Court Failed to Properly Consider the Proportionality of the Death Penalty for Mr. Carr, Violating his Liberty Interests under the State's Sentencing Statute as Guaranteed by the Eighth and Fourteenth Amendments.**

### a. Statement of the Claim

Mississippi state law requires review of the proportionality of a death sentence on appeal. Miss. Code Ann. § 99-19-105(3)(c) (1989). On review, the Mississippi Supreme Court must compare the record of the instant case with the death sentences imposed in other capital cases. *Jackson v. State*, 337 So.2d 1242, 1255-56 (Miss. 1976) ("The record will be reviewed and compared with similar cases to determine whether the punishment of death is too great . . . and to assure that the death penalty will not be wantonly or freakishly imposed but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances."); *cf. Coleman v. State*, 378 So.2d 640, 647 (Miss. 1979) (noting that on appellate review of death penalty cases, comparison with other cases where death penalty was upheld is constitutionally adequate).

The Fourteenth Amendment's Due Process Clause safeguards individual liberty interests established as a matter of state-law guarantees. *See, e.g.*, *Vitek v. Jones*, 445 U.S. 480 (1980) (holding that a liberty interest governed the determination of a prisoner's involuntary transfer of to a mental hospital). The Supreme Court has repeatedly held that state statutes may themselves create these liberty interests. *Id.* at 488; *see also Hicks*, 447 U.S. at 346 (the Fourteenth Amendment preserves state-created liberty interests "against arbitrary deprivation by the State").

A key requirement for the death penalty to withstand Eighth Amendment scrutiny is its consistent application. *Furman*, 408 U.S. at 277 ("The more significant function of the [cruel and unusual punishment] Clause, therefore, is to protect against the danger of . . . arbitrary

infliction") (Brennan, J., concurring). An integral element of Mississippi's post-*Furman* capital scheme is the state high court's statutory requirement to vacate any disproportionate death sentence, a feature that replicated an integral element of Georgia's post-*Furman* statute upheld in *Gregg v. Georgia*, 428 U.S. 153, 203 (1976) (finding sentencing statute constitutional in part due to appellate review procedures designed to "determine whether [a death sentence] is proportional to other sentences imposed for similar crimes"),. Prior to *Woodson v. North Carolina*, 428 U.S. 280 (1976), Mississippi had legislated a post-*Furman* statute susceptible to construction as mandatorily imposing death for certain crimes (e.g., "Every person who shall be convicted of capital murder shall be sentenced by the courts to death." Miss. Code Ann. § 97-3-21 (1974)), and only after *Woodson* struck down North Carolina's scheme and *Gregg* upheld Georgia's did the Mississippi Supreme Court add that it would save the 1974 statute by holding, inter alia,

> that cases in which a sentence of death is imposed will be automatically reviewed as preference cases in this Court. The record will be reviewed and compared with similar cases to determine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other, and to assure that the death penalty will not be wantonly or freakishly imposed but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances.

Jackson, 337 So.2d at 1255-56, generally superseded by statute as recognized by Gray v. State, 351 So.2d 1342 (Miss. 1977).

### b. Factual Grounds

The facts set forth herein support this claim and, by this specific reference, the allegations raised elsewhere in this pleading relevant to this claim are fully incorporated herein.

On direct review, Mr. Carr offered the Mississippi Supreme Court three reasons under § 99-19-105(3)(c) why the penalty of death was disproportionate in his case: "1) his mental retardation [sic] and organic brain damage; 2) the fact that the jury did not find that he killed or

attempted to kill; and 3) the fact that Anthony Carr's participation, if any, was minor." Appellant Br. 94-95.

### c. Procedural Matters

The state courts adjudicated this issue, *Carr I*, 655 So.2d at 857-58, rendering a decision based on unreasonable determinations of fact and that is contrary to and an unreasonable application of the constitutional authorities. § 2254(d).

## VI. PRAYER FOR RELIEF

For the foregoing reasons, Petitioner respectfully prays that this Court:

a. Issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in this petition;

b. Conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in his petitions;

c. Permit him because of his indigence to proceed without payment of costs;

d. Grant Petitioner sufficient funds to secure the expert and investigative assistance necessary to prove the facts as alleged in this petition;

e. Allow discovery, pursuant to Rule 6, Rules Governing § 2254 Cases;

f. Under Habeas Rule 7, allow Petitioner to amend further his petition after the assistance of experts and discovery, and in the event of any other changes in the law or facts relevant to his case;

g. Under Habeas Rule 8, where proof may be offered and argument advanced concerning the allegations set forth in his petitions;

h. Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by his petitions;

i. Under § 2243, ¶ 6, and Habeas Rule 5(e), allow Petitioner to respond to any procedural or affirmative defenses, and to any other arguments that the Respondent might raise in this action; and

j. Grant such other relief as may be necessary and appropriate.

DATED:  September 14, 2020                    Respectfully submitted,

/s/ Laura Welikson
LAURA WELIKSON
Bradley Arant Boult Cummings LLP
One Jackson Place
188 E. Capital Street, Ste. 1000
Jackson, MS 39201
(601) 592-9959 (tel.)
(601) 948-3000 (fax)
lwelikson@bradley.com

/s/ Joseph J. Perkovich
JOSEPH J. PERKOVICH
Phillips Black, Inc.
P.O. Box 4544
New York, NY 10163-4544
(212) 400-1660 (tel.)
(888) 543-4964 (fax)
j.perkovich@phillipsblack.org